**In re Floyd Allen KORHONEN, Debtor.**

**Floyd Allen Korhonen, Plaintiff,**

v.

**Educational Credit Management Corporation, Defendant.**

**Floyd Allen Korhonen, Plaintiff,**

v.

**United States Department of Education, Defendant.**

Bankruptcy No. 02–50708.
Adversary Nos. 03–5011, 03–5017.

United States Bankruptcy Court, D. Minnesota.

June 30, 2003.

Gwen Updegraff, for Floyd Allen Korhonen.

William J. Fisher, for Educational Credit Management Corporation.

Perry Sekus, Assistant United States Attorney, for United States Department of Education.

## MEMORANDUM ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

These proceedings came on for a joint trial on June 23, 2003. Gwen Updegraff appeared for the plaintiff. William J. Fisher appeared on behalf of defendant Educational Credit Management Corporation, and Perry Sekus, Assistant United States Attorney, appeared on behalf of defendant United States Department of Education.

## BACKGROUND

The plaintiff, Floyd Korhonen, is forty two years old, homeless, and owed at the time of filing over $110,000 in student loans. Korhonen's difficulties began early in life. In both grade school and high school he struggled academically and socially. These struggles eventually contributed to his decision to drop out of school in the eighth grade.

In 1990, Korhonen received his GED and returned to school. In September of 1990, he began studies at the Duluth Community College Center, (now Lake Superior College), and Hibbing Community College and took general remedial courses. In June of 1991, Korhonen transferred to the University of Minnesota at Duluth, and began working towards a Bachelor's degree in Psychology. Later, Korhonen

changed his major to Interdisciplinary Studies in Environmental and Population Psychology. In 1992, Korhonen transferred to the Minneapolis campus of the University of Minnesota, but returned to UMD in 1995. Korhonen also studied at Lulea Technical University in Lulea, Sweden from September of 1997 to November of 1998.

From the beginning of his studies, Korhonen experienced academic problems with a number of his courses, and these problems intensified in 1995. During that year, Penny Kragun referred him for a psychological evaluation at the Human Development Center, and in October of 1995, Korhonen met with Carolyn Phelps, a psychologist at HDC. Phelps diagnosed him with Attention Deficit Disorder and noted that he also exhibited emotional distancing. Following this evaluation, Korhonen's instructors provided him with accommodations such as administering exams in a place free from distractions, and allowing him extra time during test taking.

While enrolled at UMD, Korhonen held a number of jobs: servicing heavy equipment for Arrowhead Tree Service from February until June of 1991; repairing small engines for Denny's Lawn and Garden from June until December of 1991; driving a van for Carrier Express in Minneapolis for one month; assembling lab equipment at the University's research labs for one and one half years; and working at the University's food service as a cook.

Korhonen continued to experience academic difficulties and did not complete the course work required for graduation. In 1998, Korhonen withdrew from school. Thereafter, Korhonen went to work for Custom Concepts Auto Body for seven months until the company fired him for poor work performance and for "being too slow."

In November of 2000, Korhonen accepted a full time position as a grant facilitator for the Yukon Koyukuk School District in Ruby, Alaska. In March of 2001, Korhonen and his employer at the school district mutually agreed to terminate his employment due to a conflict between Korhonen and another person at the school district.

Korhonen returned to Duluth and began work full time as a custodian for UMD. The position's rate of pay was seven dollars an hour. In July of 2001, while working at UMD, Korhonen accidentally injured his left knee, and in November of 2001, Korhonen underwent arthroscopic surgery to repair the injury. However, he has permanent damage to his knee which limits his ability to kneel, squat, crawl or stand for prolonged periods. In September of 2001, Korhonen's employment at UMD was terminated because he was no longer enrolled as a student. From October of 2002 until January 13, 2003 when he was laid off, Korhonen worked full time for Plumrite laying out pipes and installing plumbing fixtures. This job's rate of pay was eight dollars an hour. This job marked Korhonen's last position of stable employment.

In addition to his knee injury, Korhonen sustained a stress fracture in the winter of 2002. He also experienced problems with his left ankle. In August of 2002, Korhonen re-injured this ankle and currently experiences pain after extensive walking.

Korhonen applied for Social Security disability benefits in 2001 because he believed he was unable to support himself through employment due to his physical and psychological problems. The Social Security Administration referred him to their consulting psychologist, Marcus Desmonde. On March 20, 2002, Desmonde, in a report to the Social Security Administration, diagnosed Korhonen with Attention Deficit/Hyperactivity Disorder, primary in-

attentive type, adjustment disorder with depressive mood, and hypertension. In his Employability Statement, Desmonde opined that Korhonen appeared capable of understanding instructions, but that he may have difficulty carrying out tasks in a timely fashion due to his ADHD, and that he may have difficulty tolerating the stress and pressure of full time competitive employment.

The Social Security Administration determined that Korhonen suffered from a severe impairment, but that he did not meet or equal the required impairments for disability and denied his request for benefits. He is currently appealing this denial. Korhonen is also pursuing a Worker's Compensation claim against the University of Minnesota.

Korhonen did not file income tax returns in 1998, 1999, 2001, and 2002 because his income was lower than the required filing amount. Korhonen did, however, file an income tax return for the year 2000, and his refund was taken by the government through the offset program to pay on his student loans.

In June of 2003, Korhonen went to live with a friend, Phillip Lundberg. In lieu of rent, Korhonen assisted Lundberg with home maintenance projects and sometimes repaired washing machines in the Laundromat Lundberg owns. Korhonen's only other income is from occasional mechanical work he may do for acquaintances. After a conflict, Lundberg kicked Korhonen out of his home. Currently, Korhonen is unemployed, homeless, and living in a hunting camp in the woods. He is also receiving general assistance of $203 per month.

Korhonen's current fixed monthly expenses total $753.28. This amount does not even include the money he will need for shelter, which at the very least could total $300, or the costs for electricity, water and gas which could total between $100 to $200 per month. As of June 12, 2003, the balance on his Federal Family Education Loans with the United States Department of Education with interest and penalties total $37,798.73. As of March 6, 2003, the balance on his Federal Direct Loans owed to Educational Credit Management Corporation total $29,588.02. In addition, Korhonen owes the University of Minnesota $7,721 in Perkins Loans.

In these adversary proceedings, Korhonen seeks a determination that his student loans owed to the Department of Education and to ECMC are not excepted from his discharge.[1]

## DISCUSSION

■ Pursuant to 11 U.S.C. § 523(a)(8), a student loan debt is excepted from discharge "unless excepting such debt from discharge...will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The debtor bears the burden of proving undue hardship by a preponderance of the evidence. *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 292 B.R. 635, 638 (8th Cir. BAP 2003). Undue hardship is not defined in the Bankruptcy Code.

■ In the Eighth Circuit, the test for undue hardship requires an inquiry into the totality of circumstances with special attention to the debtor's past, current, and reasonably reliable future financial resources; the reasonable necessary living expenses of the debtor and the debtor's dependents; and any other relevant facts

---

1. In addition to these two adversary proceedings, Korhonen filed adversary proceedings against SLM Corporation (Sallie Mae) and the University of Minnesota, requesting a similar determination as to debts of $40,000 and $8,000 respectively. In the face of the University's sovereign immunity claim, the plaintiff stipulated to dismissal of his dischargeability claim for the Perkins loans. Their dischargeability remains undetermined.

and circumstances unique to the particular bankruptcy case. *Id.* (citing *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir.2003); *Andrews v. S.D. Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702 (8th Cir.1981); *Andresen v. Neb. Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 139–140 (8th Cir. BAP 1999)). I conclude that the debtor has met his burden, and thus, his student loans are not excepted from his discharge.

The defendants argue that Korhonen, is eligible to participate in the Department of Education's Income Contingent Repayment Plan, but has refused to enroll. Under this plan, with income of approximately $6,000, his student loan balance of approximately $70,000, and his family size of one would require him to pay nothing towards his student loans each month.[2] Thus, the defendants reason, there is no undue hardship.

The Income Contingent Repayment Program permits a student loan debtor to pay twenty percent of the difference between his adjusted gross income and the poverty level for his family size, or the amount the debtor would pay if the debt were repaid in twelve years, whichever is less. Under the program, the borrower's monthly repayment amount is adjusted each year to reflect any changes in these factors. The borrower's repayments may also be adjusted during the year based on special circumstances. *See* 34 C.F.R. § 685.209(c)(3). At the end of the twenty five year payment period, any remaining loan balance would be cancelled by the Secretary of Education. However, the amount discharged would be considered taxable income. *See Grawey v. Illinois Student Assistance Commission (In re Grawey)*, 2001 WL 34076376 (Bankr.

C.D.Ill.); *Leahy v. Illinois Student Assistance Commission (In re Leahy)*, 2001 WL 34079569 (Bankr.C.D.Ill.); *In re Thomsen*, 234 B.R. 506, 509–510 (Bankr. D.Mont.1999).

## APPLICATION OF THE TOTALITY OF THE CIRCUMSTANCES TEST

The defendants do not really argue that making present or even future payments on the student loans would constitute anything other than undue hardship. The debtor has no present ability to make the scheduled loan payments, nor will he ever have that ability, given his level of education and skills, and his physical and mental disabilities. The defendants only real argument is based on the Income Contingency Repayment Plan. The defendants' argument is nothing less than a per se rule that there can never be a discharge of a student loan for an undue hardship where the debtor is eligible for the Income Contingent Repayment Plan. This cannot be right. The Income Contingent Repayment Plan cannot trump the Congressionally mandated individualized determination of undue hardship. The Income Contingent Repayment Plan is but one factor to be considered in determining undue hardship, but it is not determinative. *See In re Grawey*, 2001 WL 34076376, at *4; *In re Leahy*, 2001 WL 34079569, at *2; *In re Herrmann*, 2000 WL 33961388, at *3 (Bankr.C.D.Ill.).

The Income Contingent Repayment Plan is not always a feasible option. It permits negative amortization; a borrower can be in the program for twenty five years or more; and even if the remaining loan balance is cancelled when the borrower completes the program without full repayment, the unpaid amount including in-

**2.** Korhonen will pay nothing unless his adjusted gross income exceeds $8,980, the poverty level.

terest is then treated as taxable income to the borrower, which may result in a large amount of nondischargeable tax debt. *In re Grawey*, 2001 WL 34076376, at *4 (citing *In re Thomsen*, 234 B.R. at 509–510). In addition, even a debtor who pays little or nothing on student loans under the Income Contingent Repayment Plan will carry the every increasing debt for the better part of his life, eliminating or severely curtailing the debtor's ability to incur credit in an increasingly credit driven economy.

Korhonen, as an unskilled laborer, has earned up to $500 per month from odd jobs, while his monthly expenses have consistently been in excess of $700 and will most certainly rise. Including expenses for shelter and utilities means Korhonen's expenses will be an absolute minimum of $1,100 or $1,200 per month. Korhonen has suffered from psychological problems for most of his life. These problems have caused him difficulty interacting with individuals in a structured setting. Moreover, these problems, as well as his recent physical ailments, help to contribute to his pattern of not being able to retain employment for longer than a few months. Korhonen has consistently attempted to seek employment that is within his physical and psychological limitations, but the employment he has attained has been temporary and sporadic. It is highly unlikely that Korhonen's psychological and physical situation will change significantly in the future. Thus, his financial resources are likely to stay limited as well. Moreover, it is doubtful that Korhonen's student loans will ever be repaid. This fact is not disputed by the defendants. The loans would haunt him for twenty five years and then create an income liability he could not pay.

Unlike the Income Contingent Repayment Plan, bankruptcy relief is designed to give the honest but unfortunate debtor a fresh start, and although government guaranteed student loans are meant to be more difficult to discharge than general unsecured debts, they are not meant to be impossible to discharge. *Id.* This debtor is exactly the type of individual that the undue hardship discharge provision was devised to benefit.

### CONCLUSION

The plaintiff will never be able to make meaningful payments on his student loans and excepting them from discharge would impose an undue hardship on him.

### ORDER

THEREFORE IT IS ORDERED:

The plaintiff's debts to the defendants are not excepted from his discharge.

LET JUDGMENTS BE ENTERED ACCORDINGLY.