**In re Allan Anselm NANTON–MARIE, Debtor.**

**Allan Anselm Nanton–Marie, Plaintiff,**

v.

**United States Department of Education, NCO Financial Systems, Inc. Educational Credit Management Corp., University of California, et al., Defendants.**

Bankruptcy No. 01–43583–BKC–AJC.
Adversary No. 03–1302–BKC–AJC–A.

United States Bankruptcy Court,
S.D. Florida.

Dec. 1, 2003.

---

Grisel Alonso, Esq., for U.S. Dept. of Education, John D. Eaton, Esq. for Educational Credit Mgt., Steel, Hector & Davis, LLP, Miami, FL, for Defendants.

## MEMORANDUM OPINION DETERMINING DISCHARGEABILITY OF STUDENT LOANS

A. JAY CRISTOL, Bankruptcy Judge.

THIS CAUSE came before the Court for trial on October 23, 2003 upon the Complaint filed by the Debtor on April 22, 2003 commencing this adversary proceeding. The Debtor, Allan Anselm Nanton–Marie, seeks to obtain discharge of obligations to the United States Department of Education and ECMC of student loans incurred approximately 16 years ago.

The Debtor *pro se* filed a petition under Chapter 7 of the Bankruptcy Code and obtained a discharge on April 8, 2002 [C.P. 6]. However, as he testified, the Debtor was not aware of a limitation on the discharge of student loans at the time he filed. He is destitute and without a lawyer. He explained on cross-examination that he filed this adversary proceeding because, after receiving his discharge, he continued to be dunned for student loans by the Department of Education and ECMC.

Preparation for trial and the drafting of a pretrial order were difficult because of the *pro se* status of the Debtor. Counsel for the United States Department of Education and ECMC were kind, patient, understanding and helpful. The United States Department of Education indicated its desire to transport a witness from California to Miami to testify about the exact amount due on the Debtor's student loans, but the Court felt that such expense was both unnecessary and premature. If the Court decided in favor of the Debtor's

claim of undue hardship and discharged the debt, the exact amount to the penny was of no further importance because the Debtor agrees the amount is "approximately $80,000." The Court treated the amount of the debt in the light most favorable to the creditors and considered it to be approximately $80,000. The Court's decision in this case would be the same if the debt was a larger sum or if it was only $70,000 or $60,000. The Court therefore ordered the trial bifurcated and dealt only with the primary issue of undue hardship and reserved to the creditors the right to further proceedings to establish to the penny the exact amount of the debt, in the event creditors prevailed and Debtor was not able to prove undue hardship.

The Debtor is a 57 year old man, born in Trinidad, who has lived legally on green card status in the United States for almost 20 years. He would like to become a citizen but cannot afford the expense of an immigration attorney to assist him in the legal process. He is small of stature and of slight build, obviously not suited to extended heavy manual labor. The Court observed Debtor to be modest, polite, intimidated, extremely naive and totally "out of sync" with the ways of the world and the good life most people enjoy here in Miami. He did have a simplistic knowledge of the *Brunner* criteria for discharge of student loans. *See Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395 (2d Cir.1987).

His undisputed testimony establishes that he has spent most of the last two decades in abject poverty. His testimony indicates that including unemployment compensation received over the last dozen years or so, that his average annual income (with the exception of one twenty month period) has been in the range of $7,000 to $8,000, always below the poverty level as indicated by ECMC's Exhibit H,

admitted into evidence without objection. Also admitted into evidence were pictures of the Debtor's present place of residence, an apartment that does not appear to be fit for human habitation. It shows signs of being infested by rats and is in an extremely run down condition. The Debtor's testimony suggested that complaints to the landlord about the conditions of the premises have gone unheeded. In any event, the Debtor is presently in the process of moving from this $600 per month rental apartment to a single, unfurnished room for which he will pay $425 per month rent, not because of the horrible condition of the apartment, but because he cannot afford to live there.

The case has been difficult to try because of the inability and ineptness of the Debtor in presenting his case, his lack of understanding as to how to present a case and what may be presented as evidence, and his lack of understanding of the difference between evidence and argument. Nevertheless, as previously noted, opposing counsel have been kind in working with the Debtor to complete the pretrial procedures and bring this matter before the Court for final determination.

The Debtor was permitted to file a written opening statement and upon commencement of the trial the Debtor was sworn and he confirmed under oath that the written opening statement was his testimony. The Court finds the testimony credible and essentially un-refuted. It is set forth herewith verbatim:

"Debtor/Plaintiff, Allan Anselm Nanton–Marie, ('Debtor') in accordance with the Order Setting Filing and Disclosure Requirement, for Pretrial and Trial 11 A., hereby submits his written Opening Statement.

1. Sixteen years ago, Debtor the first born of fourteen siblings, who has been poor all his life, never attended high school

and graduated from a college without walls, where he had no grade point average, sought to better his lot by matriculating at the University of California, Los Angeles, School of Law ("UCLAW"), where he first incurred student loans. By the end of the first semester in 1987, Debtor was forced to withdraw for failure to maintain satisfactory grades. Debtor was readmitted in the fall of 1989 but was scholastically dismissed from UCLAW for academic incompetence in June 1990. In a non-appealable action, Debtor was permanently dismissed from UCLAW in July 1990. (see Debtor's UCLAW transcript, inadequate grade point average reports, denial into UCLAW's summer program and Assistant Dean of Students letter, marked as Debtor's exhibit's I, XX and XX1).

2. Immediate post UCLAW, Debtor fell on hard times, became homeless and applied for and received welfare. (see Debtor's exhibit XVI) After over 13 years of destitution and poverty, Debtor sought protection from creditors through a Chapter 7 Bankruptcy in December 2001. Approximately one and a half years later, Debtor realized that notwithstanding the relief he got under the Chapter 7 discharge, his circumstances were such that he still could not pay his defaulted student loans. Twenty enterties [sic] representing multiple creditors continued to hound Debtor for approximately $80,000 in student loans. This adversary proceeding followed in April 2003 and Debtor gave proper notice of this action to all twenty parties.

3. Sixteen years having passed since Debtor first incurred loans and notwithstanding this court's decision to allow co-defendants to proceed without a clear, current accounting of the specifics Debtor believes is incorporated in Defendants initial burden of proving a debt exist, Debtor

is still not clear what is the exact debt, interest and other related costs associated with such loans.

4. Debtor asserts that pursuant to U.S.C. 523(8)(1) an objective review of the preponderance of the evidence will show:

A. That the Debtor has been unable based on current or an average of his past income and expenses to maintain a minimal standard of living over the last 16–28 years because:

i. Dismissal from UCLAW and foreclosure of jobs in the profession of law and the consequence of this non-appealable dismissal has made it impossible for Debtor to repay student loans.

ii. Admission, readmission and denial in the UCLAW summer head start program to Debtor based on his application which revealed serious academic impediment described supra, places the UCLAW which showed misconduct by admitting Debtor in the first place and then not giving the same assistance it gave to similarly situated students.

iii. Debtor's available Income Tax Records (IRS) show that for several years within the last 16–28 years his income has been $0.00.

iv. Debtor's available IRS show that over the last 16 years, when the Debtor first incurred student loans at UCLAW, he earned an average of approximately $5,345.24 per annum which is $3,634 below the poverty level for 2003.

v. Debtor has been homeless and a pauper and remains destitute due to terminating Unemployment Benefits on November 1st., 2003.

vi. Historically, Debtor has lived and continues to live in substandard housing in the worst areas of town due to poverty and bad credit.

vii.   Debtor's barebones current expenses makes no provision for full daily meals, personal toiletaries [sic], health, life, vision, dental or renters insurance, meals outside the home, recreation, car repairs, clothing, regular hair-cuts or IRA payments much less pay student loans.

vii.   IRS, Bureau of Census, U.S. Department of Commerce, U.S. Department of Agriculture, U.S. Department of Housing and Urban Development, American Automobile Association and other subjective factors and statistics all put Debtor at or below the poverty level standard of living.

viii.   Sporadic employment and economic history based on IRS and U.S. Social Security Administration information puts Debtor at a poverty standard of living over the last 28 years.

ix.   Debtor has maximize [sic] his income and minimized his expenses over the last 28 years but is still at the poverty level today.

x.   Debtor's networth [sic] of $2,300.78 with an unreliable, broken old car, no furniture, no bed, no real estate, patent, franchise, boats, aircraft, partnerships, equitable, future, contingent or noncontingent interest shows no assets.

2.   Here is strong evidence supporting the fact that additional circumstances exist indicating that this state of affairs has persisted and exceed a significant portion of the repayment period of the loans because:

A.   If we go back to when Debtor was 41, and first borrowed student loans, 17 years have now passed, a period well beyond the loan repayment.

B.   If we go back to when Debtor was 44, and was kicked out of UCLAW 13 years have passed, a period well beyond the loan repayment.

C.   If we go back to when Debtor was 48, and had exhausted the deferments and hardship forebearances [sic] 9.75 years have passed, well beyond a reasonable repayment period.

D.   Debtor's age, race, and lack of alien acculturation, academic background and other circumstances represent unique and extraordinary matters which will persist over a significant portion of the repayment of the loans.

E.   Foreclosure of Federal jobs which require U.S. citizenship

F.   Foreclosure of job in area of retraining as Episcopal priest because of credit background.

G.   Possible foreclosure of job as civil servant because Debtor fired.

3.   Debtor further argues that he has made good faith efforts to repay the student loans because:

A.   Debtor has made thousands of job applications since 1987, when he first enrolled at UCLAW, until today as evidenced by over 400 job denials.

B.   Made 23 partial payments from 1989–1993 when his gross wage was only $3,359.

C.   Seeking, obtaining and exhausting deferments and hardship forebearances over a six year period,

D.   Seeking legal counsel in this pro se matter

E.   Partial payments on student loans.

F.   Doing all within powers to pass UCLAW course including repeating first year course.

G.   Appealing dismissal in a non-appealable hearing.

H.   Seeking legal and other work during all of 1987 to the present.

As a result of the foregoing, plus other objective and subjective factors to be proved, it will become clear that Debtor can carry his burden of proving that not discharging his student loans to all creditors listed in Debtor's petition will impose an undue hardship on him under the Brunner test.

DATED this 21st., October 2003.

Respectfully submitted,

[signature of Allan Anselm Nanton–Marie]
ALLAN ANSELM NANTON–MARIE
Debtor/Plaintiff, Pro se"

█ The Debtor argued that he is entitled to a hardship discharge under the *Brunner* doctrine and has done his best to present evidence on the three prongs of the *Brunner* doctrine. The Creditors have taken the position that Debtor is unable to qualify for discharge of these debts under the *Brunner* doctrine. For one thing, the Creditors wish to use as a standard of Debtor's income, his income over a period of the twenty months when he had held a job with the State of Florida and his income was over $20,000 annually. Although the Debtor did his best to keep the State of Florida job, he was terminated during his probationary first year for inability to perform the job. Creditors argue that the Court should consider this period as a base period and a predicate for future earnings of this Debtor notwithstanding the fact that the Debtor lost the job, is now unemployed, and has been since unable to obtain employment.

Debtor offered "mountains" of testimonial evidence as to his efforts to obtain work. The Debtor incurred his student loan debt trying to become a lawyer, but that failed and he was flunked out of law school. He tried again and flunked again. Then he sought work as a paralegal. He testified that he was sent out on paralegal jobs to various law firms in New York by a temporary employment agency. Although he was sent on numerous jobs his skills as a paralegal were not adequate to obtain permanent work as a paralegal. The temporary route is a usual road to permanent work by competent paralegals who seek permanent positions.

The Debtor also became an ordained Episcopalian priest, but testified that he has been unable to obtain a position with the church. He believes this is because of his credit situation and his student loans. Whether that is the only reason that he cannot obtain employment with his church, or whether he lacks other qualifications to serve as an Episcopalian priest is not fully established, but is also not important. He is unable to get a job as a priest with the church.

He has sought countless jobs in the government sector where the Court observes he probably has the best opportunity of obtaining a job because in that forum there is the least chance of discrimination based on race, color or xenophobia.

His testimony is undisputed that he has also worked when he could, loading and unloading trucks, loading and unloading airplanes, moving traffic cones and cleaning debris. It is clear to the Court that the Debtor is entirely sincere, although perhaps in some or many areas, inept.

The Debtor's testimony is also un-refuted that for periods of time he has been homeless. The Court finds it curious that Creditor's counsel, on cross-examination, seemed anxious to attack him for making $10 gifts to charity or his church at a time when he was homeless. The Court supposes that this line of questioning was perhaps intended to demonstrate some flaw in Debtor's character but the Court is unable to deduce any negative inference from same.

The Debtor scheduled his personal automobile in his bankruptcy schedules. He listed his 1990 Ford Tempo at a value of $1,000. Because the Court is familiar with automobile prices as numerous automobile valuations pass before the Court each week, the Court was suspicious of this value and researched the Kelly Blue Book which indicated a 1990 Ford Tempo with an odometer reading of over 100,000 miles was of no value. At trial, the Debtor testified that his Ford had over 120,000 miles, the engine did not run and a tire was soft. He testified that he came to Court for the trial by bus and does not have money to have the car repaired.

It is also undisputed that the Debtor is suffering from advanced glaucoma. He has no health insurance. He is required to spend $146.97 every month for Xalaltan, Timolol and ocumeter to treat his glaucoma which hopefully will prevent him from becoming blind. He also must pay $130.00 every four months for treatment of the condition by a doctor. The Court takes judicial notice that mild glaucoma is treated with one medication, more serious cases with two medications and severe conditions with three or more. On cross-examination the Creditors established that Debtor is able to see, he is able to read (an examination of his opening statement demonstrates the extent of his ability to write) and that he can even drive an automobile. Thus, the Creditors argued that his health is not a factor on the undue hardship issue. The Court disagrees. The fact that Debtor is taking 3 distinct drugs for his glaucoma indicates his condition is quite severe; it is not subject to control by a single drug used in more mild cases. The Court is not persuaded by the Creditors' position that Debtor's condition is due hardship as opposed to *un*due hardship.

While the Eleventh Circuit has not yet adopted a test for determining what constitutes "undue hardship," the parties seem.in accord that the issue of "undue hardship" should be analyzed in accordance with the *Brunner* decision. Although a variety of tests have evolved to address the issue of what constitutes "undue hardship," the parties have tailored their cases to address the prongs delineated in the *Brunner* case. The Court will therefore determine whether the facts in this case and the circumstances in which the Debtor finds himself meet the three prongs of the *Brunner* test so as to permit the discharge of debts incurred to attend a law school program which was not successfully completed due to academic failure.

In *Brunner,* the Second Circuit established a three-part test to determine if repayment of a student loan will impose an undue hardship on the debtor. This test has been adopted by the Third, Seventh and Ninth Circuits. *See Brunner,* 831 F.2d 395, 396; *In re Pena,* 155 F.3d 1108, 1112 (9th Cir.1998); *In re Faish,* 72 F.3d 298 (3d Cir.1995); and *Matter of Roberson,* 999 F.2d 1132 (7th Cir.1993). The *Brunner* test requires a debtor to prove

1. That the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living if forced to repay the loans;

2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

3. That the debtor has made good faith efforts to repay the loans.

If the debtor fails to satisfy any one prong of the *Brunner* test, then "the bankruptcy court's inquiry must end there, with a finding of no dischargeability." *Faish,* 72 F.3d at 306.

In this case, the Debtor meets all of the *Brunner* criteria. The foregoing facts demonstrate that the Debtor cannot main-

tain a "minimal" standard of living based on his current income and expenses, whether he is forced to repay the loan or not. Debtor's standard of living today, and for most of the past 16 years, has been below the poverty level. As it is, Debtor's current income does not meet his absolute necessary expenses. He is barely able to subsist. Forcing him to repay Creditors' loans would certainly burden the Debtor with additional expenses he could not afford to pay and any payment would sacrifice basic necessities of life. Finding otherwise would literally take food from the Debtor's mouth.

Additional circumstances exist which indicate Debtor's current state of affairs is likely to persist for a significant portion of the repayment period of the student loans. When the Debtor was younger and healthier than he is today, and when there was hope he would be a lawyer or priest or even a paralegal, it is conceivable to have thought that the Debtor's state of affairs could have improved. However, to say the Debtor is marginally employable now is an overstatement. At the Debtor's current age, with Debtor's education and skill, and in advanced stages of glaucoma, it is unlikely to believe that the Debtor's dim state of affairs will ever see brighter times during his lifetime, let alone during the repayment period of the student loans.

The Debtor is a poor, tragic, unfortunate individual who, after failing to have secured employment as a professional, paraprofessional or day laborer, made some attempts at repaying his loans. The Debtor testified that he made 23 partial payments from 1989 to 1993 when his gross wages were only $3,359. The Court believes this shows the Debtor's good faith effort at attempts to repay the loan so as to meet the criteria under *Brunner*. Actually, under the totality of the circumstances in this case, the Court believes

that the foregoing facts and circumstances would justify an undue hardship discharge under any of the tests used today to find "undue hardship."

■ Finally, the Creditors have taken the position that the Debtor is barred from seeking an undue hardship discharge because the Debtor did not apply for the Ford Program which would allow him to obtain reduced payments against his loan and to make payments thereon for a period of 25 years. The evidence in this case suggests that the Debtor was not even aware of the income contingent repayment plan program until after he learned that student loans were not routinely dischargeable in bankruptcy and he had filed this undue hardship adversary proceeding. The Debtor is 57. It would appear that he would therefore only be required to make payments until 2027, when he will be approximately 82 years old. The Court is not impressed with the argument that the failure to participate in the Ford Program is a bar to an undue hardship discharge. While that program may be available, there is no section of the Bankruptcy Code that requires it as a condition precedent to an undue hardship discharge. *See Korhonen v. Educational Credit Management Corp. (In re Korhonen)*, 296 B.R. 492 (Bankr.D.Minn.2003).

In *Korhonen*, the primary issue before the court was whether the debtor's failure to participate in the Income Contingency Repayment Plan, when eligible to do so, is a bar to proving undue hardship. The court stated:

> The defendants' argument is nothing less than a per se rule that there can never be a discharge of a student loan for an undue hardship where the debtor is eligible for the Income Contingent Repayment Plan. This cannot be right. The Income Contingent Repayment Plan cannot trump the Congressionally

mandated individualized determination of undue hardship. The Income Contingent Repayment Plan is but one factor to be considered in determining undue hardship, but it is not determinative. *Korhonen,* 296 B.R. at 496 (citations omitted).

The Income Contingent Repayment Plan is not always a feasible option. It permits negative amortization; a borrower can be in the program for twenty five years or more; and even if the remaining loan balance is cancelled when the borrower completes the program without full repayment, the unpaid amount including interest is then treated as taxable income to the borrower, which may result in a large amount of nondischargeable tax debt. *Korhonen,* 296 B.R. at 496 (citations omitted). In addition, even a debtor who pays little or nothing on student loans under the Income Contingent Repayment Plan will carry the every [sic] increasing debt for the better part of his life, eliminating or severely curtailing the debtor's ability to incur credit in an increasingly credit driven economy. *Korhonen,* 296 B.R. at 496–97 (citations omitted).

This Court is persuaded by the opinion of Bankruptcy Judge Kressel in *Korhonen* and concludes that participation, or nonparticipation as the case may be, "is but one factor to be considered in determining undue hardship, but it is not determinative." 296 B.R. at 497 (citations omitted). Thus, even considering the Debtor's nonparticipation in the Ford Program, the Court finds that the Debtor has met all of the prongs of the *Brunner* test, qualifying him for a hardship discharge.

One last point the Court wishes to address is the Debtor's savings. On cross-examination, the Creditors raised the fact that the Debtor maintains savings in the form of two IRA accounts. Surely the Creditors could not be insinuating that the Debtor has amassed a huge "nest-egg" for his retirement years. The two IRA accounts fluctuate in value due to market conditions. One account is valued at between $749 and $1,200 and the other, between $5,200.00 and $7,000.00. No doubt Debtor will be able to live his last years in high style with this huge retirement fund—not. The Court notes that this small "fortune" is exempt under Florida law and not available to pay Creditors' claims even if the Creditors' debts are not discharged. The fact that the Debtor has a small retirement fund savings account is insignificant and does not otherwise persuade this Court to find the Creditors' debts to be nondischargeable. The Debtor will never be able to make meaningful payments on his student loans and excepting them from discharge would impose an undue hardship.

Even if the Court had not been persuaded that the Debtor had carried his burden of proof and had decided this case in favor of the Creditors, finding that the Debtor's hardship was due rather than undue and thus non-dischargeable, so what! The Creditors would then spend several thousand dollars more on transporting a witness or witnesses from California to Florida to testify as to the total debt owed and then allow the Debtor to participate in an income contingent repayment plan, where he might be required to pay a minuscule sum each month which would not cover the interest accruing on the approximate $80,000 debt, so that finally at age 82, if he is able to live that long, he will be forgiven of substantially larger debt. If he cannot make any payments, will it be appropriate to reopen a Debtor's prison just for him? I think not.

By any standard, denial of discharge of these student loans to this Debtor would create an undue hardship. The Debtor

could not maintain a minimal standard of living if required to repay any portion of his student loan debts. His health, his age, and his inability to obtain and keep steady employment and his feeble but good faith efforts to repay his loans entitle the Debtor to an undue hardship discharge of these debts. Accordingly, it is

**ORDERED AND ADJUDGED** that the Plaintiff/Debtor is granted an "undue hardship" discharge and the debts owed to the Defendants/Creditors are not excepted from the Debtor's previously issued discharge.