ELECTRONIC CITATION:  2005 FED App. 0006P (6th Cir.)
File Name:  05b0006p.06

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

In re:   LISA MARIE HERTZEL,           )
                                       )
           Debtor.                     )
_____   )
                                       )
LISA MARIE HERTZEL,                    )
                                       )
           Plaintiff-Appellee,         )
                                       )
      v.                               )      No. 04-8083
                                       )
EDUCATIONAL CREDIT                     )
MANAGEMENT CORPORATION,                )
                                       )
           Defendant-Appellant.        )
_____   )

Appeal from the United States Bankruptcy Court
for the Northern District of Ohio, at Canton.
Bankruptcy Case No. 03-63933; Adversary Case No. 03-6135.

Submitted:  May 4, 2005

Decided and Filed:  August 30, 2005

Before: AUG, LATTA, and PARSONS, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ON BRIEF:**  Frederick S. Coombs III, HARRINGTON, HOPPE & MITCHELL, Youngstown, Ohio, for Appellee.  Lisa Marie Hertzel, Massillon, Ohio, pro se.

---

## OPINION

---

J. VINCENT AUG, JR., Chief Bankruptcy Appellate Panel Judge. Educational Credit Management Corporation ("ECMC") appeals the order of the bankruptcy court granting the Debtor, Lisa Marie Hertzel, a discharge of her student loans on the basis that excepting the loans from discharge would impose an undue hardship on the Debtor pursuant to 11 U.S.C. § 523(a)(8). For the reasons that follow, the decision of the bankruptcy court is **AFFIRMED**.

## I.    ISSUES ON APPEAL

1.      Whether the bankruptcy court's determination that excepting the Debtor's student loans from discharge will impose an undue hardship on the Debtor, was clearly erroneous.

2.      Whether under the second prong of the *Brunner* test, the bankruptcy court may take judicial notice of the long-term effect or likely prognosis of a debtor's well-known medical condition.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit ("BAP") has jurisdiction to hear and decide this appeal. The United States District Court for the Northern District of Ohio has authorized appeals to the BAP. A "final order" of a bankruptcy court may be appealed by right under 28 U.S.C. § 158(a)(1). For purposes of an appeal, an order is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted). A bankruptcy court's judgment determining dischargeability is a final and appealable order. *Cundiff v. Cundiff (In re Cundiff)*, 227 B.R. 476, 477 (B.A.P. 6th Cir. 1998) (citations omitted).

The appellate court reviews conclusions of law de novo. "'De novo review requires the Panel to review questions of law independent of the bankruptcy court's determination.'" *Bailey v. Bailey (In re Bailey)*, 254 B.R. 901, 903 (B.A.P. 6th Cir. 2000) (quoting *First Union Mortgage Corp. v. Eubanks (In re Eubanks)*, 219 B.R. 468, 469 (B.A.P. 6th Cir. 1998) (omitting citations)). "Determinations of dischargeability under 11 U.S.C. § 523 are conclusions of law reviewed de novo." *In re Bailey*, 254 B.R. at 903, (citing *Hart v. Molino (In re Molino)*, 225 B.R. 904, 906 (B.A.P. 6th Cir. 1998)); *see also Sorah v. Sorah (In re Sorah)*, 163 F.3d 397, 400 (6th Cir. 1998) (holding that "the interpretation of § 523 is a legal issue that we review *de novo*"). But the BAP must "'affirm the underlying factual determinations unless they are clearly erroneous.'" *In re Bailey*, 254 B.R. at 903 (quoting *In re Molino*, 225 B.R. at 906). A factual determination is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Bailey*, 254 B.R. at 903 (internal quotations and citations omitted).

## III.   FACTS

The Debtor, a 35-year-old single woman suffering from multiple sclerosis, filed her chapter 7 petition on July 24, 2003. On November 17, 2003, she filed a complaint to determine the dischargeability of her student loans. The trial on the Debtor's complaint was held on May 24, 2004.

Between June 1994 and September 1996, the Debtor incurred six student loans which enabled her to obtain a Master of Education in Community Counseling in 1997 from Kent State University.[1] As of December 18, 2003, the total amount owed on the loans, including interest and costs, was $66,915.47.[2]

Shortly after obtaining her master's degree, the Debtor was diagnosed with depression, anxiety, and obsessive-compulsive disorder. In May 2001, she began experiencing symptoms of

---

[1]The Debtor also obtained a Bachelor of Arts in Criminal Justice and Community Counseling in 1992 from Kent State University. That degree, however, was funded by Pell grants rather than student loans.

[2]The Debtor's testimony indicates that this figure is broken down as $41,718.67 in principal, $11,815.63 in interest, and $13,381.17 in costs.

multiple sclerosis, which was eventually diagnosed in December 2002. According to a letter[3] from her doctor submitted at trial, the debtor's "diagnosis is relapsing/remitting multiple sclerosis, depression, and history of visual disturbances. . . . She has some blurring in her right eye as well as a weakness in her right hand and leg. Due to her condition she needs to have ongoing care and is in need of Copaxone." (Joint Appendix at 13 (hereinafter, the Joint Appendix will be referred to as "J.A.").) The debtor testified at trial that she was currently on Copaxone, which with insurance coverage costs her $20 per month, and that the drug had been helpful in alleviating some of her symptoms. Notwithstanding the medication, the Debtor continues to have "good days and bad days with [her] eyes" (J.A. at 52) including visual difficulties and pain in her right eye and sinuses, and she has problems with her memory and concentration.

The Debtor's career goal when she went back to school to obtain her master's degree was to be a private counselor or therapist working with children and adolescents. In that career, the Debtor anticipated earning $45,000 to $50,000 per year. However, to take full benefit of her education, the Debtor needed to take and pass her Licensed Professional Counselor ("LPC") exam. She apparently took the test one time and did not pass. The Debtor testified that over the last couple of years she had attempted to study the materials in order to retake the test, but had been unable to retain the data. The Debtor testified that even if she obtained a job in her ideal position as a counselor, she would not be able to do the work because of the memory and concentration problems caused by the MS.

The Debtor's employment history since she obtained her master's degree is as follows:

The Debtor was first employed in a full-time position with the Department of Human Services in their Department of Reunification where the Debtor worked with children with severe mental disabilities and mental health issues. The position was grant-funded and lasted only about a year or until May 1998.

The Debtor was unemployed from May 1998 until October 1998 when she obtained a position through the Ohio Department of Youth Services, Indian River, at a maximum security prison for teenage boys in Massillon, Ohio. The Debtor held this position for approximately ten and

---

[3] The letter is dated January 22, 2002, but appears to have been written in 2003 since it refers to a doctor's visit and the MS diagnosis in September 2002 and December 2002 respectively.

a half months (October 1998 until approximately August 1999) until she was involved in a car accident in which she suffered several broken bones. Because she was going to require at least three months to recover from her injuries and she did not yet qualify for the Family Medical Leave Act, her employer would not hold her job position open for her during her recovery period and she eventually lost her job.

The Debtor remained unemployed until she obtained a temporary position with the Census Bureau from April 2000 though September 2000. After that time period, she was again unemployed. The Debtor testified that during the time periods she was unemployed she sought employment and went on many interviews but that no one would hire her because she had not passed the LPC exam. The Debtor lived on various forms of public assistance until she obtained a part-time job in September 2002 working at the Massillon Shelter for women and children who had been victims of domestic violence. In March 2003, the Debtor was offered and she accepted a full-time position at the shelter even though it had been recommended that she reduce her work hours due to her MS. In early 2004, the debtor broke her ankle, necessitating surgery and extended medical leave, but was back in full-time employment at the shelter at the time of the trial on May 24, 2004. However, the Debtor did testify that the shelter is funded by grants and that there had been some discussion about shutting down the shelter.

With respect to her income and expenses, the Debtor testified that Schedules I and J accurately reflected her income and expenses at the time of trial. Schedule I shows that the Debtor has a monthly gross income of $1,607.16 and that she nets $1,274.62 after taxes of $267.70 and health insurance of $64.84. The Debtor's income as shown on her 2003 tax return is $22,342.00. The Debtor's 2003 W-2 statement from the shelter reflects income of $17,867.48. The Debtor testified that in 2003 she also earned approximately $4,000.00 from a job as a loan closer. She further testified that she was not earning as much income from the loan closing job as she did previously since the company had hired a full-time loan closer and now only needed to use the Debtor's services on an emergency basis. On March 18, 2003, the Debtor received a letter from the shelter indicating that her annual salary would be $19,760.00 or $1,646.66 per month prior to taxes. That figure is substantially consistent with the gross income figure of $1,607.16 reflected on the Debtor's Schedule I. Schedule J reflects monthly expenses of $1,404.00 as follows:

| | |
|---|---:|
| Rent | $450.00 |
| Electricity and heating | 30.00 |
| Telephone | 50.00 |
| Food | 150.00 |
| Laundry and dry cleaning | 10.00 |
| Medical and dental expenses | 200.00 |
| Transportation | 100.00 |
| Health insurance | 65.00 |
| Auto insurance | 134.00 |
| Cigarette and internet connection | 115.00 |
| Total | $1,404.00 |

With respect to payment of her student loans, the Debtor obtained deferments but was finally told she was out of deferments. The Debtor testified that she attempted to consolidate her loans but was told she could not do so because she was in default and the loans had been turned over to a collection agency. Between March 2000 and February 2003, the Department of Treasury seized the Debtor's tax refunds totaling $3,084.25 and applied them to her student loans. Debtor has made no voluntary payments on her student loans.

The Debtor applied for disability benefits with the Social Security Administration, but by correspondence dated June 2, 2003, her application was denied. The Social Security Administration stated that the Debtor's "medical condition is not so severe as to prevent [her] from doing most of [her] usual activities, including working." (J.A. at 15.)

The Debtor's annual income is above the poverty guidelines for a single person with no dependents.

In rendering its decision from the bench, the bankruptcy court found that the Debtor met the three parts of the *Brunner* test which was recently adopted by the Sixth Circuit Court of Appeals. *See Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F. 3d 382, 385 (6th Cir. 2005). The court discharged all of the Debtor's student loans, and ECMC filed its timely appeal.

## IV. DISCUSSION

The Bankruptcy Code provides:

> A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8). The BAP has recently addressed the issue of interpreting undue hardship in the Sixth Circuit:

> While "undue hardship," the standard for the discharge of student loans, is not a defined term in the Bankruptcy Code, the Court of Appeals for the Sixth Circuit has consistently used, and very recently explicitly adopted, the *Brunner* test for undue hardship. *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382 (6th Cir. 2005). The Sixth Circuit has summarized the *Brunner* test as follows:
>
>> The *Brunner* test requires a three-part showing by the debtor:
>>
>> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Fields v. Sallie Mae Servicing Corp. (In re Fields)*, 326 B.R. 676, 681 (B.A.P. 6th Cir. 2005) (quoting *Miller v. Pa. Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, 623 (6th Cir. 2004)). To discharge her student loans, the Debtor must show by a preponderance of the evidence that she satisfies all three parts of the *Brunner* test. *In re Miller*, 377 F.3d at 623.

In *In re Oyler*, the Sixth Circuit specifically incorporated into the *Brunner* test the so-called "other factors" enumerated in *Hornsby v. Tennessee Student Assistance Corp. (In re Hornsby)*, 144 F.3d 433, 437 (6th Cir. 1998) and *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir. 1996). *In re Fields*, 326 B.R. at 682 (citing *In re Oyler*, 397 F.3d 382).

> "Other factors," now part of the *Brunner* test, include a debtor's expenses, standard of living, amount of outstanding debt, and ability to maximize income. [*In re Oyler*,

397 F.3d 382]; *see also In re Rice*, 78 F.3d at 1149-50 (listing as "other factors" income, earning ability, health, educational background, dependents, age, accumulated wealth, and professional degree.).

*Id.*

A.     <u>Whether The Debtor Can Maintain A Minimal Standard Of Living</u>.

The bankruptcy court found that the Debtor could not maintain a minimal standard of living if forced to repay her student loans. In making this determination, the bankruptcy court considered the "Internal Revenue standard for its collection procedures manual" and found that:

> In this particular case, if we were to compare the IRS's collection standards for what is specifically defined by the IRS to be a hardship, the Debtor would be permitted substantially more income than she currently has. But more significantly, if we just look at common sense of what the Debtor is netting on her paycheck and look at what we all know are the expenses that it takes to live from day to day in Stark County, it's clear that the Debtor is expressing an inability to maintain the minimal standard of living.

(J.A. at 99.) Although the bankruptcy court did not state separately the details specifically related to the Debtor's income and expenses that were relevant to its decision, the record supports the bankruptcy court's finding that the Debtor met the first prong of the *Brunner* test.

ECMC argues that the Debtor's income tax return reflects income of $22,342.00 for 2003 and that her gross monthly income, therefore, is $1,858.00 per month rather than the $1,607.00 claimed by the Debtor in Schedule I. However, as noted above, the Debtor explained that approximately $4,000.00 of her 2003 income was obtained from a job that she no longer anticipates will generate much, if any, income. As such, the Debtor's monthly income is $1,646.66 per month based on her gross annual income of $19,760.00 as reflected by the employment letter from the shelter. If the Debtor's taxes of approximately $267.70 are deducted from this figure, a monthly net income of $1,378.96 results. This figure is still $25.00 short of meeting Debtor's monthly expenses of $1,404.00.[4]

---

[4]Although the Debtor deducted twice for her health insurance (once on Schedule I and again on Schedule J), we did not deduct for health insurance from her gross income, but included it in her expenses.

ECMC suggested that the Debtor could cut her expenses if she were to quit smoking. The Debtor's testimony indicates she spends approximately $90 per month on cigarettes and smokes about one package per day. The Debtor testified that she has previously taken medication to try to quit smoking but has been unsuccessful. The Debtor has itemized no other amount on Schedule J for recreation or entertainment. If the Debtor were to try to quit smoking again in order to cut her expenses, the medication she may need in order to quit may well be as expensive as the cigarettes she is purchasing. In any event, the amount she may eventually save would first go to clearing out the remaining deficit in the Debtor's monthly budget. As the bankruptcy court found:

> Even if the Debtor were able to cut expenses, the amount that's available as we look at the expenses that are there and the income that she has coming in, even if the expenses were cut, there are many things that the Debtor either currently needs or would need in the immediate future that would take up any nominal cut of expenses.

(J.A. at 101.) This finding of the bankruptcy court is not clearly erroneous. The bankruptcy court correctly found that the Debtor's expenses as itemized on Schedule J (and listed above) are reasonable.

The bankruptcy court's finding that the Debtor met the first prong of the *Brunner* test in that she is currently unable to maintain a minimal standard of living is not clearly erroneous.

B.      Whether Additional Circumstances Exist Indicating That The State Of Affairs Is Likely To Persist For A Significant Portion Of The Repayment Period.

The court of appeals has given the following guidance about the application of the second prong of the *Brunner* test:

> To demonstrate that the debtor's current "state of affairs is likely to persist for a significant portion of the repayment period of the student loans," as required by *Brunner*'s second prong, the debtor must precisely identify her problems and explain how her condition would impair her ability to work in the future. The dischargeability of loans should be based upon "a certainty of hopelessness, not merely a present inability to fulfill financial commitment."

*Tirch v. Penn. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 681 (6th Cir. 2005) (citations omitted).

The Debtor relies upon her MS diagnosis to meet this prong of the *Brunner* test. ECMC argues that the Debtor has not proven that her condition is so severe that she cannot work. As support for this position, ECMC points to the denial of disability benefits by the Social Security Administration and the language in the letter from the Social Security Administration indicating that the Debtor's condition does not prevent her from "doing most of [her] usual activities, including working." ECMC also argues that it was improper for the bankruptcy court to take judicial notice of the likely prognosis of an individual with MS.

In analyzing the second prong of the *Brunner* test, the Sixth Circuit recently stated that the additional circumstances that might exist, "may include illness, disability, a lack of useable job skills, or the existence of a large number of dependents. And, most importantly, they must be beyond the debtor's control, not borne of free choice." *In re Oyler*, 397 F.3d at 386 (citations omitted).

In finding that the Debtor met this part of the *Brunner* test, the bankruptcy court stated:

[T]here has been a diagnosis of [multiple sclerosis], and a specific phase. The doctor even put a specific phase of multiple sclerosis into . . . the letter. And we know that from the nature of multiple sclerosis there are flare-ups that can be far apart or close together, but that when it's reached the phase that the Debtor is currently in, the base level of disability and the absence of those flare-ups does not improve. You return to a base level which is basically what it is, and then at some point if the disease will continue to progress, there would be a higher level of disability, but that the base level of disability, with the exception of the flare-ups, will not improve. And of course it will be much worse for the periods of the flare-ups. So knowing the nature of multiple sclerosis and that it's a progressive disease and just what are essentially the assumed and generally medically acceptable factors of what multiple sclerosis entails, we know that there are additional circumstances in this case.

(J.A. at 100.) In making this finding, the bankruptcy court did not disagree with the Social Security Administration's determination that the Debtor was currently able to work. And the Debtor is not arguing that she cannot work. In fact, as noted above, subsequent to her MS diagnosis, the Debtor took a full-time position, contrary to recommendations, when it became available to her at her current place of employment.

The bankruptcy court found that even though the Debtor could work, there were restrictions on her ability to work that would bar her from doing materially better. The court also determined that even if the Debtor were able to cut expenses, any small amount of excess income would be

needed by the Debtor in the immediate future. The bankruptcy court's analysis can be summarized as follows: The Debtor cannot maintain a minimal standard of living at this point and because of her MS, which is a progressive disease, even if she does not get worse because of her condition, she is not going to get any better.

*Judicial Notice*.

> With respect to judicial notice, the Federal Rules of Evidence[5] provide:
>
>> (b) *Kinds of Facts*. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>>
>> (c) *When Discretionary*. A court may take judicial notice, whether requested or not.
>>
>> . . . .
>>
>> (e) *Opportunity to Be Heard*. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.
>>
>> (f) *Time of Taking Notice*. Judicial notice may be taken at any stage of the proceeding.

Fed. R. Evid. 201.

The bankruptcy court in *Norasteh v. Dept. of Educ. (In re Norasteh)*, 311 B.R. 671, 678 (Bankr. S.D.N.Y. 2004) recognized that in undue hardship cases, debtors often do not have the money to pay medical experts to testify on their behalf. In such situations, the courts "have relied on available medical literature in deciding if the debtor's medical condition met the second prong of the *Brunner* test." *Id.* The court in *In re Norasteh* also stated:

> At a minimum, however, a borrower seeking "an undue hardship" discharge must provide corroborative evidence that he had an impairment that prevents him from earning enough to repay his student loans, and that the impairment is likely to persist well into the future. A judge can observe the witness and hear him describe his symptoms, but a judge cannot make a diagnosis or determine the severity of the impairment based on that alone.

---

[5]"The Federal Rules of Evidence . . . apply in cases under the Code." Fed R. Bankr. P. 9017.

*Id.* (citations omitted). Even the case cited by ECMC in support of its position, *Swinney v. Academic Fin. Servs. (In re Swinney)*, 266 B.R. 800 (Bankr. N.D. Ohio 2001), supports the Debtor's assertion that she has provided sufficient evidence of the *existence* of her condition. The court in *In re Swinney* stated:

> [I]n line with the Congressional policy of making student loans more difficult to discharge, substantial credible evidence must be given which supports the existence of the mental illness. Although such evidence does not have to necessarily consist of extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position. For example, if properly authenticated, letters from a treating physician could be utilized.

*In re Swinney*, 266 B.R. at 805 (citations omitted). By virtue of the letter from her doctor that was entered into the record, the Debtor in this case has provided corroborative evidence that she does indeed suffer from MS. ECMC does not argue that the Debtor has not proven the existence of her condition. Rather, ECMC argues that there is nothing in the letter to indicate the Debtor's likely prognosis and that the bankruptcy court could not make that determination without evidence from an expert. *See Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner)*, 309 B.R. 405, 419 (Bankr. E.D.N.Y. 2004) (court cannot extrapolate from diagnosis of debtor's medical condition whether that condition will likely prevent debtor from earning enough money over time to pay his student loans).

However, many courts have taken judicial notice of the likely effects of a debtor's medical condition on the debtor's ability to pay his student loans. The bankruptcy court in the Western District of New York stated:

> In this Court's experience, however, it is extraordinary for dischargeability litigation that hinges on a debtor's medical condition to actually hinge on medical testimony. This is because all dischargeability litigation involves real persons who are *debtors* under the Bankruptcy Code, and cannot afford to hire medical experts to testify to the effect of their disease on their earning capacity. When medical testimony is offered by the debtor it is to lay skepticism to rest, and in this writer's experience the medical condition of any debtor has never been the subject of dueling experts in § 523(a)(8) litigation.
>
> So too is it common that a student loan lender has neither the financial means (spread across so many cases) nor the professional impulse to challenge a medical diagnosis or the effects thereof. Essentially, there is never an objection to the Court's taking judicial notice of the limitations imposed by a disabling impairment,

even if a debtor's disease is of the brain rather than of muscle or bone. From the creditor's side, dischargeability litigation is not something that one wants to put a great deal of money into, in light of the uncertainty of ever being able to collect, unless the debtor is very young, or has a high earning capacity or has a prospect of future wealth by inheritance or otherwise.

Thus, a great deal is left to judicial notice in dischargeability litigation. No one brings in economists or other experts to testify as to trends in the local job market, or to address the debtor's earning prospects. Nor are other experts employed to testify as to: the cost of living locally; how long cars last here; local geography and climate and its transportation problems; the effects of divorce or separation; the implications of a debtor having very young children or children who suffer some infirmity; the employment implications of the fact that the debtor had some sort of brush with the law; and the value of certain types of skill or training.

*Doherty v. United Student Aid Funds, Inc. (In re Doherty)*, 219 B.R. 665, 669 (Bankr. W.D.N.Y. 1998) (emphasis in original).

A fact finder finds not "facts," but only what the evidence suggests is, was, or will be, most probable. I take judicial notice that the most probable near-future for a debtor who suffers from a diagnosed and treated manic-depressive disorder is maintenance of the status quo. That is what is "likely."

*Id.* at 671. *See also In re Pobiner*, 309 B.R. at 419-20 (taking judicial notice of career prospects of ADHD patients as set forth in brochure published by the National Institute of Mental Health); *Nanton-Marie v. Dept. of Educ. (In re Nanton-Marie)*, 303 B.R. 228, 234 (Bankr. S.D. Fla. 2003) (taking judicial notice, without giving source, regarding differences in treatments of mild and severe glaucoma); *In re Doherty*, 219 B.R. at 670 (taking judicial notice of effects of bipolar disorder found in publications by the National Institute of Mental Health and other agencies).

Based on the above, it is clear that a bankruptcy court may take judicial notice of the effect that a debtor's well-known medical condition may have on the debtor's ability to earn a living. When giving its statements regarding the effects of MS, the bankruptcy court did not indicate the source from which it obtained its information. However, even in dictionaries, the disease is defined as a degenerative disorder. *The American Heritage College Dictionary* defines multiple sclerosis as:

A chronic degenerative disease of the central nervous system in which gradual destruction of myelin in patches throughout the brain or spinal cord or both interferes with the nerve pathways and causes muscular weakness, loss of coordination, and speech and visual disturbances.

*The American Heritage College Dictionary* 896 (3d ed. 1993). Similarly, *Webster's Third International Dictionary* defines MS as:

> a chronic progressive disease of the central nervous system marked by a patchy demyelination and hardening of nerve tissue and associated with varied motor and psychic changes depending upon the location of the lesions.

*Webster's Third International Dictionary* 1486 (3d ed. 1993). Therefore, it was not erroneous for the bankruptcy court to take judicial notice of the progressive nature of MS and find that it is unlikely that the Debtor's medical or financial condition will improve.

Part of ECMC's argument against the use of judicial notice is that ECMC was not given notice that the court would be taking judicial notice of this fact. There is no doubt that ECMC was not given prior notice of the bankruptcy court's *sua sponte* decision to take judicial notice of the likely prognosis of the Debtor's condition and the likely effect that MS would have on the Debtor's future ability to earn a living. As indicated, the bankruptcy court also failed to state the source for the information upon which it relied.

However, it is also clear that after the bankruptcy court's decision was rendered from the bench or after the entry of the order some five months later, ECMC did not file with the bankruptcy court a request pursuant to Federal Rule of Evidence 201(e) for an opportunity for a hearing as to the propriety of the court's taking judicial notice and the tenor of the matter noticed. Where a party does not make a timely request to be heard on the issue of the court's taking judicial notice, that party has waived its right to appeal the propriety of taking judicial notice or the tenor of the matter noticed. *See, e.g., Sherman v. Rose (In re Sherman)*, No. 00-8052, 2001 WL 997946, at *3 (10th Cir. Aug. 31, 2001) (appellants waived their objection to being denied an opportunity for hearing under Fed. R. Evid. 201(e) where they failed to make a request for hearing after judicial notice was taken by filing a motion to alter or amend judgment); *Job v. Calder (In re Calder),* 907 F.2d 953, 955 n.2 (10th Cir. 1990) (holding that Fed. R. Evid. 201(e) places burden on appellant to request hearing on propriety of judicial notice even after notice is taken); *MacMillan Bloedel, Ltd. v. Flintkote Co.,* 760 F.2d 580, 587-88 (5th Cir. 1985) (suggesting that failure to request hearing after court took judicial notice waives matter on appeal); *Edwards v. Hurtel*, 724 F.2d 689 (8th Cir. 1984) (issue of whether district court could take judicial notice of certain facts could not be raised for the first time on appeal).

Having failed to properly request a hearing on the issue in the bankruptcy court, ECMC has waived any objection to the use of judicial notice in this case. The bankruptcy court's taking of judicial notice of the effects of MS and finding that the Debtor met the second prong of the *Brunner* test were not clearly erroneous.

C.        Whether The Debtor Has Made A Good Faith Effort At Repayment.

The bankruptcy court also found that although the Debtor had not made any voluntary payments on her student loans, she had sought deferments for as long as she could and she sought to consolidate her loans. The court also determined that the Debtor exhibited good faith by not manipulating the tax refund process. The court found that if the Debtor had been exhibiting bad faith, she would have changed her tax withholding so that "the tax refund would have gone negative in order to prevent the student loan authorities from getting anything." (J.A. at 101.) Good faith does not solely depend on attempts at repayment:

> It is not disputed that the debtor never repaid any part of [his student loans], but this does not end the inquiry into his good faith. A finding of good faith instead turns on several considerations including the debtor's efforts to obtain employment, maximize his income, minimize his expenses, and participate in alternative repayment options.

*In re Norasteh*, 311 B.R. at 676 (citations omitted). The Debtor in this case testified as to her efforts to obtain employment and in fact, took a full-time position when it became available. The Debtor's expenses are reasonable. Although she did not retake the LPC exam which might have maximized her income for a period of time, the Debtor testified that even if she had passed the LPC exam, she would not now be able to perform the duties of a counselor because of her MS.

Subsequent to the bankruptcy court's decision in this case, the court of appeals has recently stated that:

> While not a *per se* indication of a lack of good faith, [the debtor's] decision not to take advantage of the [William D. Ford Income Contingent Repayment Program] is probative of her intent to repay her loans. In cases involving a partial discharge of student loans, it is a difficult, although not necessarily an insurmountable burden for a debtor who is offered, but then declines the government's income contingent repayment program, to come to this Court and seek an equitable adjustment of their student loan debt.

*In re Tirch*, 409 F.3d at 682 (internal quotations and citations omitted). With respect to the Debtor's attempts to take advantage of the William D. Ford Income Contingent Repayment Program (ICR Program), the Debtor testified that she was told that she could not qualify for the ICR Program because her loans were in default. ECMC's argument that the Debtor has failed to demonstrate good faith because of her failure to attempt to participate in the ICR Program is controverted by the Debtor's testimony. Further, Debtor was not given any assistance or information on how to make herself eligible for the program. Contrary to ECMC's arguments, the Debtor did not fail to take advantage of "an ICR that would have been advantageous," *In re Tirch*, 409 F.3d at 683, but was denied that possible benefit. In this particular case, the Debtor's failure to participate in the ICR Program cannot be held against her.

The bankruptcy court's finding that the Debtor met the good faith prong of the *Brunner* test is also not clearly erroneous.

## V.   CONCLUSION

For the foregoing reasons, the decision of the bankruptcy court is **AFFIRMED**.