In re Paul A. POBINER, Debtor.

Paul A. Pobiner, Plaintiff,

v.

Educational Credit Management Corporation, et al., Defendant.

Bankruptcy No. 801–87694–mlc.
Adversary No. 801–8390–dte.

United States Bankruptcy Court, E.D. New York.

April 1, 2004.

Pullman & Comley, By Sheila Denton, Bridgeport, CT, for the Defendant ECMC.

Richard L. Stern, Macco & Stern, Melville, NY, Chapter 7 Trustee.

## DECISION ON DISCHARGEABILITY OF STUDENT LOANS

DOROTHY EISENBERG, Bankruptcy Judge.

Before the Court is an adversary proceeding commenced by Paul A. Pobiner (the "Debtor" or the "Plaintiff") against Educational Credit Management Corporation ("ECMC" or the "Defendant"),[1] the holder of eleven separate student loans made by various banking institutions to the Debtor pre-petition, requesting this Court to determine the dischargeability of said loans pursuant to Section 523(a)(8) of the Bankruptcy Code.

The Court conducted a trial on October 7, 8 and 22, 2003. After consideration of the testimony of the witnesses, the documentary evidence, argument by counsel and the post-trial filings, the Court has determined that the Plaintiff has not proved all of the elements which must be established to support a finding by this Court that he is entitled to discharge the student loans based on undue hardship pursuant to Section 523(a)(8) of the Bankruptcy Court and the controlling case law. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

### FINDINGS OF FACT

1. Plaintiff is a 43 year old male, married to Donna Pobiner, who at the time of

Klestadt & Winters, By John E. Jureller, Jr., New York City, for the Plaintiff.

---

1. ECMC is a Minnesota not-for-profit corporation created under the direction of the United States Department of Education ("DOE") to provide specialized guarantor services to the DOE pursuant to the Federal Family Education Loan Program ("FFELP"), including accepting transfer of title to certain student loan accounts on which the student loan borrower has filed bankruptcy. ECMC was substituted as a defendant in this adversary proceeding by stipulation approved by the Court on December 28, 2001 and is the sole remaining defendant.

trial was on leave of absence from her employment to take care of the couple's infant son.

2. On October 17, 2001 (the "Petition Date"), Plaintiff filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. On October 31, 2001, he commenced this adversary proceeding.

## A. Plaintiff's Educational and Student Loan History

3. Plaintiff attended State University of New York at Albany from 1977 through 1981 where he received a bachelor's degree in psychology and sociology, receiving scholarships and achieving grades which made him eligible for dean's list.

4. Plaintiff attended St. John's University School of Law ("St. John's"), in Queens, New York, from 1988 through 1994. Plaintiff testified that he struggled to finish law school throughout six years of full-time studies. During this time, he suffered medical problems resulting from a scuba diving injury and a fall on a tennis court. He was granted a medical leave of absence while in law school in order to receive treatment related to these injuries. According to the Plaintiff, he had difficulties with his law school classes despite his efforts to study "diligently." Plaintiff also testified that during this period he was treated for obsessive-compulsive disorder, depression and Attention Deficit Hyperactivity Disorder ("ADHD") and that his physician(s) prescribed various prescription medications to treat these conditions. However, at trial Plaintiff did not produce any of his physicians or other expert witnesses to corroborate this testimony.[2] As a result of Plaintiff's various medical problems, for a time, Plaintiff was placed on economic probation by St. John's. Notwithstanding his struggles with most of his courses[3] and his absences, Plaintiff was able to graduate with a J.D. degree in May of 1994.

5. While attending St. John's, Plaintiff incurred student loans to pay for his tuition and related expenses, including room and board. Plaintiff financed his education, in part, through the Guaranteed Student Loan Program and testified that he would not have been able to attend law school had he not received financial aid. All the student loans were incurred by Plaintiff during law school. Plaintiff's spouse neither guaranteed nor co-signed any of the student loans.

Plaintiff executed eleven promissory notes as part of the federal loan program with disbursements in the total amount of $65,000.00, which are more specifically set forth in the table below. Six of the promissory notes, each in the amount of $7,500.00, were for Guaranteed Student Loans ("GSL"), and five of the promissory notes, each in the amount of $4,000.00 were for Federal Supplemental Loans ("SLS").

| Loan Number | Loan Type | Disbursement Date | Disbursement Amount |
| --- | --- | --- | --- |
| 1 | GSL | 12/01/88 | $ 7,500.00 |
| 2 | SLS | 08/02/88 | $ 4,000.00 |
| 3 | GSL | 08/06/92 | $ 7,500.00 |
| 4 | GSL | 02/08/94 | $ 7,500.00 |

**2.** Plaintiff's spouse, who is not a medical professional, testified that Plaintiff had a difficult time extracting the key points from the legal cases he was studying. She stated that he would focus too much on the detail and that "he missed the forest for the trees." She also testified that he had a very difficult time organizing himself, prioritizing what to work on, and that he would get extremely anxious when he was called on in class or when he had to take a test.

**3.** Plaintiff received high grades in courses dealing with research, assertive advocacy and legal writing.

| 5 | SLS | 12/18/91 | $ 4,000.00 |
| 6 | SLS | 08/03/90 | $ 4,000.00 |
| 7 | SLS | 08/05/92 | $ 4,000.00 |
| 8 | SLS | 08/16/89 | $ 4,000.00 |
| 9 | GSL | 08/16/89 | $ 7,500.00 |
| 10 | GSL | 08/02/90 | $ 7,500.00 |
| 11 | GSL | 12/19/91 | $ 7,500.00 |
| | | | |
| **TOTAL** | | | **$65,000.00** |

6. The repayment dates for the SLS loans were on or about February 20, 1995. The GSL loans became due on or about March 1, 1995, February 20, 1995, December 13, 1999, December 15, 1990, May 15, 1992 and December 4, 1992.

7. During the period from January 1995 to October 1996, Plaintiff made payments of $2,351.11 to Sallie Mae Servicing Corporation. Plaintiff made payments to American Education Services totaling $7,470.01 from October 1992 to January 1998. Additionally, several payments of interest only were made to Sallie Mae Servicing Corporation between December 1998 and November 1999, totaling approximately $930.00. In all, Plaintiff repaid approximately $10,751.12 of the aforementioned student loans.

8. Plaintiff was granted a series of deferments and forbearances for each loan during the time period between the initial repayment due date and the Petition Date. Plaintiff also received various unemployment and full-time school deferments along with various temporary hardship, economic, and administrative forbearances.

9. Plaintiff's bankruptcy filing constituted an event that entitled the original lenders to call on the guarantees of the prior holders. Those entities thereafter assigned their interest in the loans to ECMC as the specialized guarantor/servicer to the Department of Education. As of September 28, 2003, the balance due and owing by Plaintiff to ECMC was $72,673.31, including interest. Interest continues to accrue at the per diem rate of $10.56.

**B. Plaintiff's Efforts to Pass the Bar Exam**

10. After completing law school and earning a J.D. degree in May 1994, the Plaintiff took the New York and Massachusetts Bar Examinations (the "Bar Exams") with the intent to practice law and to work as an attorney. Prior to sitting for each test, the Plaintiff attended Bar Exam review courses as an aid to studying for the two State Bar Exams and the Multi–State Bar Exam (the "Review Courses"). Plaintiff was advised by those who administered the Review Course for the State Bar Exams to take both the New York and Massachusetts Bar Exams to increase his chances of passing a bar examination.

11. At trial, Plaintiff testified that he could not finish the New York, Massachusetts or Multi–State Bar Exams in the time allotted.

12. In November 1994, Plaintiff learned that he did not pass the July 1994 Bar Exams.

13. Plaintiff did not sit for the bar examinations offered in February 1995, July 1995 or February 1996.

14. Plaintiff took the New York and Massachusetts Bar Exams a second time in July 1996, after again attending Review Courses to assist him in achieving a passing score. Plaintiff testified that he devoted himself full-time to studying for the exams over a period of at least two months. Plaintiff was again unsuccessful in his attempt to pass. He testified that he had the same problem as he had the first time-he did not finish the examinations-and that his scores were about the same.

15. Plaintiff did not sit for the bar examinations offered in February 1997, July 1997 or February 1998.

16. Initially, Plaintiff decided to take the New York and Massachusetts Bar Exams for a third time in July 1998 and inquired about the availability of special accommodations (e.g., extra time). Plaintiff discussed with an attorney his chances of obtaining special accommodations and sought information related thereto. Plaintiff testified that he could not afford to retain the attorney due to financial constraints, his inability to obtain further funding, and his unwillingness to go further into debt. Ultimately, Plaintiff never applied for an accommodation for the July 1998 Bar Exams. Rather, Plaintiff determined approximately a week before the July 1998 Bar Exams were to be administered that he would be unsuccessful in his third attempt to achieve a passing score and did not sit for the exams. He testified that he felt he was not ready based on the results he achieved on the practice exams he was taking.

## C. Plaintiff's Employment History

17. Prior to entering law school, Plaintiff worked for a number of years in the investment field. He applied for and received his General Securities Registrations, Series 7, 6 and 63 licenses. He testified that at that time his goal was to be employed in the investment banking field working for himself. Plaintiff also worked in the retail field for a brief period of time, selling audio-visual products and equipment.

18. Plaintiff decided to attend law school in order to increase his earning potential.

19. During law school, Plaintiff had several "handyman" construction jobs. He also participated in several internships for law school credit, worked as a paralegal for a few months through an employment agency and worked for West Services, Inc. as an instructor.

20. Plaintiff testified that, after graduating law school, he circulated hundreds, if not thousands, of resumes to prospective employers in the legal field and in other fields (e.g. Home Depot). The Court notes that the Plaintiff circulated a resume highlighting his legal education and experience to all potential employers and did not customize a separate resume for submission to prospective employers who were not in the legal field.

21. Since graduation, as a result of his inability to achieve a passing score on the Bar Exam, Plaintiff has been unable to obtain employment in the legal profession.

## D. Plaintiff's Construction Business

22. After his decision not to take the July 1998 Bar Exams, Plaintiff decided to change careers and start his own construction company on a full-time basis. He had been working as a handyman for many years and was "getting better at it." He discussed this decision with his spouse and in November 1998 applied for his business certificate under the name "Gold Coast Remodeling and Restoration" ("Gold Coast"). His business license was issued on April 1, 1999 (Exh. 42).

23. Both the Plaintiff and his spouse believe that this construction business is the best opportunity for the Plaintiff to earn a living, in light of his inability to pass the Bar Exams, his inability to secure any other employment, his limitations regarding deadlines, organizational skills, problems with focusing and handling stress, and overall high level of anxiety and the side effects from his medications.

24. Plaintiff and his spouse testified that she financed the business with the understanding that Plaintiff would pay her

back. However, there is no documentary evidence of the amount of the loans or that they were, in fact, loans and not gifts. Even though there is no evidence of such loans, the Plaintiff's schedules and statements list a debt to Donna Pobiner in the amount of $125,000. Neither Plaintiff nor his spouse testified with any specificity as to the amounts lent to Gold Coast (the name of the Debtor's business), pre- or post-petition, the amounts paid back by Plaintiff or the terms of any of these alleged loans. Plaintiff professed at trial that he intended to repay every penny to his spouse.

25. Although Plaintiff testified that he did not work at all in 2001 because his license expired and he did not have the funds to renew it, he stated that he currently had numerous jobs "in the works," including a closet repair, a bathroom remodeling, a kitchen remodeling, and some smaller jobs. He testified that he was getting word of mouth referrals, he expected his construction business to be successful, he probably would gross $15,000 to $20,000 in 2003 and that thereafter he expects to gross $30,000 to $40,000 a year. Donna Pobiner also testified that she expected Plaintiff's business to begin succeeding very shortly.

### E. The Pobiner Household Income

26. The financial picture of the Pobiner household was established through exhibits and testimony. Since the marriage in 1991, Debtor's spouse has been the primary breadwinner for the household. She is employed at Met Life in the annuity department, but is currently on unpaid maternity leave.

27. The joint income tax returns filed by the Pobiners for the years 1999[4] through 2000 revealed the following:

| Year | Total Gross Income | Adjusted Gross Income |
|------|------|------|
| 1999 | $102,749.00 | $72,689.00 |
| 2000 | 96,285.00 | 57,175.00 |
| 2001 | 102,534.00 | 80,589.00 |
| 2002 | 98,425.00 | 98,310.00 |

(Exh. 32). Plaintiff's individual earnings from his general contracting business, Gold Coast, were reflected on Schedule C of the tax returns, as follows:

| Year | Gross Receipts | Gross Income | Total Expenses | Profit/ Loss |
|------|------|------|------|------|
| 1999 | $ 9,962.00 | $ 791.00 | $37,311.00 | ($36,520.00) |
| 2000 | 19,206.00 | (2,405.00) | 10,518.00 | (42,814.00) |
| 2001 | 4,744.00 | 878.00 | 26,959.00 | (26,081.00) |
| 2002 | 12,205.00 | 9,823.00 | 9,739.00 | 84.00 |

As reflected in the foregoing table, Gold Coast began to turn a profit in 2002.

28. Because Plaintiff and Donna Pobiner filed joint tax returns, the tax savings to Donna Pobiner by virtue of Plaintiff's losses were significant. For example, she reduced her tax burden by approximately $7,155 in 2001, $11,311 in 2000, and $10,248 in 1999. (Exh. 32, I.R.S.1999 Inst. 1040 Tax Tables, I.R.S.2000 Inst. 1040 Tax Tables; I.R.S.2001 Inst. 1040 Tax Tables, available at *http://irs.gov/formspubs/article/0.id=98339.00.html.*) In fact, the Pobiners received refunds of $9,391 in 1999, $11,518 in 2000, $7,155 in 2001 and $285 in 2002.

29. Donna Pobiner testified that upon her expected return to work full-time in January 2004, her annual income would be $100,000, which, according to the Court's calculations, would work out to a monthly gross income of approximately $8,333.00. Her net income is $4,969 per month after taxes and automatic deductions for items

---

4. Plaintiff's social security statement (Exh. 47) reflects no taxed social security income for 1994 to 1999.

such as health/dental insurance and her 401(k) plan.

### F. Plaintiff's Expenses

30. Plaintiff's family consists of his spouse and his infant child. The family also has a dog. They reside in a cooperative apartment owned solely by Donna Pobiner.

31. Plaintiff currently earns little income through Gold Coast but he believes that his prospects are improving. All his earnings have remained in the contracting business to pay for expenses as they become due.

32. Plaintiff's reckoning of his expenses changed several times during the pendency of his bankruptcy case and this adversary proceeding. The Court finds that Donna Pobiner's testimony provided the most detailed account of the household expenses. Consequently, the Court finds that the following is a list of the Pobiners' monthly household expenses:

| | |
|---|---:|
| Co-op mortgage payment | 326.00 |
| Co-op maintenance payment | 642.00 |
| | |
| *Utilities* | |
| Electric/gas | 161.00 |
| Telephone (one land line, Donna Pobiner's cell phone, Plaintiff's cell phone) | 155.00 |
| Cable TV | 48.00 |
| Internet | 24.00 |
| Entertainment | 30.00 |
| Food | 425.00 |
| Shoes | 32.00 |
| Clothing | 115.00 |
| Laundry/dry cleaning | 50.00 |
| Haircuts | 51.00 |
| Sundries | 90.00 |
| Credit card payments | 1,685.00 |
| | |
| *Insurance* | |
| Homeowners | 64.00 |
| Automobile | 96.00 |
| Truck/commercial auto | 174.00 |
| Business | 90.00 |
| Health/dental/life | 171.00 |
| Alumni associations/continuing education | 5.00 |
| Fees to Dept. of Motor Vehicles | 27.00 |
| Trade associations/unions—ASCAP | 1.00 |
| Transportation | 25.00 |
| AAA | 6.00 |
| Charitable contributions | 46.00 |
| Miscellaneous | 65.00 |
| | |
| *Medical* | |
| ADHD specialist and medications [5] | 96.00 |
| Unreimbursed medical and prescription | 269.00 |
| Doctor visits—general practitioner | 40.00 |
| Eye care, contact lenses, supplies | 65.00 |
| Dentist | 55.00 |

5. Plaintiff testified that he was currently taking the prescription medicine Dexedrine on a daily basis.

| | |
|---|---|
| Adoption expense | 2,083.00/mo.[6] |
| | |
| *Dog care* | |
| Veterinary care | 100.00 |
| Food and supplies | 50.00 |
| | |
| *Professional Fees* | |
| Accountant | 21.00 |
| Bankruptcy/adversary proceeding | 2,085.00/mo.[7] |
| Debt collection | 104.00 |
| | |
| *Baby Expenses* | |
| Day care | 1,200.00–2,200.00 |
| Pediatrician | 25.00 |
| Food | 185.00 |
| Clothes | 100.00 |
| Sundries | 75.00 |
| Furniture, car seat, stroller, travel needs | 165.00 |
| College plan | 100.00 |
| Child development | 25.00 |
| TOTAL | $11,447.00–$12,447.00 |

(Exh. 82). After subtracting the adoption expenses of $2,083.00 per month and the bankruptcy and adversary proceeding expenses of $2,085.00 per month, the Pobiners' monthly expenses going forward total between $7,279.00 and $8,279.00.

33. Donna Pobiner's testimony revealed certain expenses which did not relate to maintaining a minimal standard of living, such as $150 per month on dog care and $100 per month on a college plan for the couple's infant son. The $1,685.00 per month in credit card expense will be eliminated at some time in the future, as a significant portion of the debt consisted of voluntary fertility treatments which have stopped, at least temporarily, if not permanently. She testified that she would not cease making contributions to her 401(k) plan in order to reduce expenses. She further testified that she would continue to visit certain doctors and a dentist outside of her healthcare network, regardless of the cost, because of her confidence in these individuals.

34. On the other hand, the Pobiners have made some efforts to minimize their household expenses, as follows:

a) Calls to Donna Pobiner's out-of-state family in Rhode Island are made only during weekends when the long distance rates are less expensive.

b) The food expense is limited to approximately $106 per week (just over $7.58 per person a day), the family does not eat out, and the one "luxury" the family enjoys is ordering Chinese takeout once or twice a month.

c) The entertainment expense consists only of the HBO channel on Cable TV, a couple of rental movies, and an occasional newspaper.

d) Plaintiff wears his workboots until the soles fall off, and his spouse only buys discounted goods.

e) Plaintiff's family has lowered the motor vehicle insurance premiums by volun-

**6.** The $2,083 per month adoption expenses will terminate now that the adoption has been finalized.

**7.** The $2,085 per month which is budgeted for this adversary proceeding will cease upon the Court's determination of this matter.

tarily taking defensive driving classes, despite a perfect driving record, and raising the deductibles to the maximum.

f) Plaintiff's family has made efforts to lower the childcare expenses by buying food and formula in bulk, accepting used clothing, furniture and toys from family and friends, borrowing toys, books and educational videos from the library, and refurbishing used toys.

g) Plaintiff's family has not had a vacation in over ten years, drives vehicles that are thirteen and sixteen years old, respectively, and performs its own repair work on the vehicles whenever possible.

h) Plaintiff's family has not bought new furniture in many years and is furnishing the cooperative apartment with used furniture.

35. According to the testimony at trial, Plaintiff and his family have been able to survive the monthly household deficit by borrowing from family, using credit cards, and depleting Donna Pobiner's IRA and savings.

36. The expenses related to Gold Coast, namely the truck insurance ($174), business insurance ($90), debt collection expenses ($104) and a portion of the internet expense ($12), are presently included in Plaintiff's household expenses as they are being paid for by his spouse's income. However, as Gold Coast becomes more profitable, it will be able to cover these expenses.

### G. Plaintiff's Discharge

37. Plaintiff received his chapter 7 discharge on January 23, 2002, which relieved him of approximately $200,000 of unsecured debt.

### H. Settlement With Other Defendants

38. By Stipulation and Order dated August 4, 2003 between Defendant St. John's and Plaintiff, Plaintiff agreed to pay St. John's the sum of $500.00, in full and final satisfaction of its loans to Plaintiff in the amount of $2,340.21, Plaintiff's student loans to St. Johns were declared to be fully discharged, and the complaint was dismissed with prejudice as against St. John's without costs to either party.

39. By Stipulation and Order dated August 4, 2003 between Defendant The Education Resources Institute, Inc. ("TERI") and Plaintiff, Plaintiff agreed to pay TERI the sum of $4,550.00, in full and final satisfaction of its loans to Plaintiff in the amount of $41,579.27, Plaintiff's student loans to TERI were declared to be fully discharged, and the complaint was dismissed with prejudice as against TERI and the Plaintiff.

40. By Stipulation and Order dated August 4, 2003 between Defendants Pennsylvania Higher Education Assistance Agency, including the Student Loan Servicing Center and Graduate Loan Center ("PHEAA"), and Plaintiff, Plaintiff's debt to PHEAA in the principal amount of $7,913.00 was discharged in full, and the complaint was dismissed without prejudice as against PHEAA without costs to PHEAA.

41. Plaintiff testified at trial that any and all settlement sums due under the Stipulations and Orders were paid in accordance with the terms of the Stipulations and Orders.

42. Consequently, the original total student loan debt of $143,158.00 has already been reduced to $72,673.31 (ECMC's approximate balance).

43. There is no credible evidence that Plaintiff has an inability to work and to earn money. To the contrary, the evidence shows the Plaintiff had the ability to graduate from law school and his performance at trial shows a continued ability to

function, to write articulately and to advocate on his own behalf. The Court finds that the Debtor himself admits that his business is growing and should result in improved income.

### I. The William D. Ford Consolidation Program

44. ECMC's representative testified regarding the William D. Ford Loan Consolidation Program (the "Consolidation Program") offered by the United States Department of Education, which allows a borrower to consolidate his student loans and, at the same time, still be eligible for deferments and forbearances. Under the Consolidation Program, the borrower would receive a blended interest rate which can result in a slightly reduced interest rate, and make payments on a variety of repayment terms. The Consolidation Program enables the borrower to pay off the consolidated loan over a period of up to thirty years.

45. The Consolidation Program offers four flexible repayment options, including one that is based on household income and family size. At any time, the borrower can switch to one of the other repayment options, depending on his circumstances.

46. The Department of Education bases the Consolidation Program on household income because it is presumed that husband and wife share their income and share their expenses.

47. According to ECMC's representative, based on an adjusted gross income of approximately $80,000 (as ascertained from Plaintiff's federal income tax return) and a debt of $72,000, the Plaintiff could make a monthly payment of $404.00 toward repayment of his student loans, for a period of 360 months. This monthly payment includes simple interest on the outstanding balance of the loan.

48. If Plaintiff falls upon severe difficulties so that he cannot make the monthly payment of $404.00, he is eligible for certain administrative remedies. For example, if he were to become totally and permanently disabled, upon the proper certification of a physician, the loan would be forgiven.

49. Alternatively, if Plaintiff were to choose the income contingent repayment plan and he has not paid off the debt after twenty-five years, then the remainder of the loan may be forgiven.

50. The Plaintiff would also have the option of petitioning the Department of Education to reduce the monthly payment based on extraordinary circumstances (such as the birth of an additional child) which necessitate the use of additional household income to pay his other expenses.

51. In addition, if the Plaintiff were to fall on hard times, he would be eligible for economic hardship deferments, during the period of which no payment would be required.

52. The Court finds that there is no evidence to indicate that the Debtor could not meet the monthly payment or obtain extended terms, if necessary, pursuant to these generous repayment options.

### DISCUSSION

The Bankruptcy Code permits a debtor to discharge student loans under certain circumstances, as set forth in Section 523(a)(8)(B), which states, in pertinent part, as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made

under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.SC. § 523(a)(8). The Bankruptcy Code does not define the phrase "undue hardship." *Brunner v. New York State Higher Educ. Services Corp.*, 46 B.R. 752, 753 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2d Cir.1987). Accordingly, it is within the discretion of the Court to decide whether the facts of a particular case, when considered in light of the Circuit's applicable legal standard, warrant the granting of a hardship discharge under Section 523(a)(8). Under the three prong test adopted by the Second Circuit in *Brunner*, 831 F.2d at 396, the Debtor will establish undue hardship only if he can demonstrate by a preponderance of the evidence that (1) the Debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the student loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) the Debtor has made good faith efforts to repay the loans. *Id.* Each part of the *Brunner* test for undue hardship discharge of student loans stands independently, and the Debtor bears the burden to prove each prong of the test. *In re Maulin*, 190 B.R. 153 (Bankr.W.D.N.Y.1995).

 The Bankruptcy Code is silent on the issue of whether a non-debtor spouse's income is to be considered in determining "undue hardship." Courts may find guidance on this issue in the existing body of case law dealing with the issue of a non-debtor spouse's income relative to, inter alia, Chapter 13 plan confirmation and dismissal of Chapter 7 cases due to substantial abuse. *In re Elmore*, 230 B.R. 22, 27 (Bankr.D.Conn.1999). In both of those contexts, the non-debtor spouse's income is considered. *See, e.g., In re Dressler*, 194 B.R. 290, 304 (Bankr.D.R.I.1996), *citing In re Cardillo*, 170 B.R. 490, 491 (Bankr. D.N.H.1994) (non-debtor spouse's income is considered in applying disposable income test); *In re Jodoin*, 209 B.R. 132, 142 (9th Cir. BAP 1997) (same); *In re Kern*, 40 B.R. 26 (Bankr.S.D.N.Y.1984) ("There is no justification for ignoring the impact of a non-petitioning spouse's income on a debtor's financial situation.") Consequently, this Court holds that the income of the Plaintiff's non-debtor spouse is properly considered in determining whether requiring repayment of the student loans would create an undue hardship. *See In re White*, 243 B.R. 498 (Bankr.N.D.Ala.1999), *reh'g denied*, 243 B.R. 515 (Bankr.N.D.Ala.1999).

## I. *Plaintiff's Household Exceeds Minimal Standard of Living.*

██ The first prong of the *Brunner* test requires a showing that the Plaintiff "cannot maintain, based on current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans." *Brunner*, 831 F.2d at 396. This minimal standard of living test requires more than a showing of tight finances. *In re Faish*, 72 F.3d 298, 306 (3d Cir.1995); *In re Elmore*, 230 B.R. 22, 26 (Bankr.D.Conn.1999).

In this case, Plaintiff has failed to demonstrate that he cannot maintain a minimal standard of living. To the contrary, the facts demonstrate that, despite the fact that he claims that he is not earning any money and has been losing money through Gold Coast, his contracting business,

Plaintiff actually is enjoying an above minimal standard of living. This includes a nice place to live, sufficient food, clothing, medical and dental insurance for his family, and even luxuries such as internet access, premium cable channels, two vehicles, life insurance, a 401(k) contribution plan through his spouse's employer and voluntary contributions to a college savings account for his infant son. In the past, the household income also supported infertility treatments and adoption expenses.

Plaintiff and his spouse's gross household income has ranged from $102,749.00 to $95,579.00. It is disingenuous for Plaintiff to argue that he cannot maintain, based on his current household income and expenses, a "minimum standard of living" when the household income has been approximately $100,000 over the past few years and is expected to increase once Donna Pobiner goes back to work. The Debtor admits that Gold Coast has begun to become profitable. In this connection, the Court notes that the Federal Poverty Level Guidelines for the year 2003 establish a poverty level for a family unit of three at $15,260.00.[8] Plaintiff's combined available income is more than six times this level. This is certainly not the "minimal" lifestyle envisioned by *Brunner*.

Notwithstanding Plaintiff's inability to pass the New York Bar Examination and secure work in the legal field, Plaintiff has not attempted to obtain a job that pays him even a minimal amount of wages. When questioned about his failure to obtain steady employment, Plaintiff testified that despite sending out hundreds or thousands of resumes, he never received any interviews or job offers. However, he never tailored his resume to the needs of prospective employers who were not in the legal field. Interestingly, Plaintiff testified that he had always intended to be his own boss, from which the Court surmises that he chose not to pursue any avenues of employment which did not permit him to achieve that goal. As one Court stated:

> The experience of life teaches us that, other than the privileged few, all encounter intervals in which they cannot do precisely what they desire because it simply does not pay enough money. A resolute determination to work in one's field of dreams, no matter how little it pays, cannot be the fundamental standard from which "undue hardship" under § 523(a)(8)(B) is measured.

*In re Healey*, 161 B.R. 389, 395 (E.D.Mich. 1993).

ECMC points out that the facts in this case are similar to the facts in *In re Pincus*, 280 B.R. 303 (Bankr.S.D.N.Y.2002). In *Pincus*, a single debtor sought to discharge his law school loans after being unable to cover his expenses. He had been diagnosed with and treated for ADHD, which he claimed had affected his law school grades and made it difficult for him to concentrate at his job. After seeking and receiving special testing accommodations, his law school grades improved significantly and he passed the bar exam. *Id.* at 310. The *Pincus* Court held that his debts were not dischargeable despite his ADHD and even though he had allegedly made good faith efforts to repay his loans. *Id.* at 315–17. The court concluded that many of his monthly expenditures—such as telephone, cable, clothing, laundry and dry cleaning, transportation, recreation, health club, etc.—were excessive. *Id.* at 318. The court also found that all of the

---

**8.** *See* Poverty Guidelines of the Department of Health and Human Services, 68 Fed. $3g. 28 (Feb. 7, 2003, pp. 6456–58).

debtor's doctors, aside from his neurologist whom he visited once or twice a year, participated in his insurance plan, so that it was reasonable to conclude that the debtor's insurance provided for an adequate level of counseling to manage and monitor his ADHD condition. *Id.* The court further found that any out-of-pocket expenses incurred by the debtor with regard to such treatment were discretionary. *Id.* Consequently, the Court found that his expenditures confirmed that he lived a comfortable lifestyle—one that was above his means—and that even though the debtor had a negative cash flow, he had not met his burden of proof with respect to the first *Brunner* factor.

The Court observes that the Plaintiff in the instant case failed to offer an adequate explanation as to why he did not obtain special accommodations for taking the July 1998 Bar Exam, but, rather, decided that he was destined to fail the exam for the third time and opted to start his remodeling business instead. In view of the fact that Plaintiff previously had come within ten points of passing the New York Bar Exam even though he had not finished the test, it is possible that he could have attained a passing grade with the aid of special accommodations. Moreover, it was apparent from the Plaintiff's articulate trial testimony that his law school education had provided him with skills which could be used in a variety of fields other than law.

In general, courts have found that failure to pass the bar exam is not a sufficient reason for the discharge of student loans. *See, e.g., In re Garrett*, 180 B.R. 358 (Bankr.D.N.H.1995) (student loans not discharged although debtor failed the bar exam, had five dependent children and suffered from medical conditions including multiple sclerosis); *In re Parks*, 293 B.R. 900 (Bankr.N.D.Ohio 2003) (student loans not discharged after debtor failed bar exam primarily due to insufficient effort to retake the exam); *In re Vinci*, 232 B.R. 644 (Bankr.E.D.Pa.1999) (student loans not discharged despite debtor's failure to pass bar exam because, even if she were to give up the practice of law altogether, it would be reasonable to expect her to be able to use her legal and other skills to earn an income sufficient to sustain herself and to repay her student loans).

Further, testimony revealed that there was not a concerted effort being made to minimize expenses. The Pobiners spend $150.00 per month on dog care, $100.00 per month on a college plan for their infant son, and $51.00 per month on haircuts. Moreover, they voluntarily contribute $462.00 per month to Donna Pobiner's 401(k) plan, while simultaneously arguing that the Court should discharge Plaintiff's $72,000 student loan debt, which will then have to be absorbed by the American taxpayers. Additionally, the Pobiners have made no effort to visit doctors and dentists within the network of their heath insurance coverage. The Court also notes that the unsubstantiated estimated daycare expenses of $1,200.00 to $2,200.00 will only last approximately five years and will cease when the child begins kindergarten. Additionally, the household could eliminate or reduce that expense if Plaintiff were to take care of their son during periods when he was not working. However, Donna Pobiner testified that they would not consider this, as she believed that the Debtor could make more money than their son's daycare would cost. In short, the Pobiners could significantly reduce their monthly expenses if they had a mind to.

In sum, the Plaintiff has not proved that he cannot maintain a minimal standard of living if forced to repay the student loans.

## II. Plaintiff Has Not Proven Additional Circumstances.

The second prong of *Brunner* requires Plaintiff to prove by a preponderance of the evidence that "additional circumstances" exist indicating that his current financial situation is likely to persist for a significant portion of the repayment period. An example of "additional circumstances" deserving of inquiry under Section 523(a)(8) would be undisputed evidence demonstrating that a debtor suffers from "a presently incurable impairment of emotional or mental functioning that is (1) recognized by the mainstream of medical professionals to be bioneurological, physiological, or of other pathological or organic origin (as opposed to a matter of volition); and (2) proven to be the cause of a particular debtor's present inability to maintain a 'minimal' standard of living for herself and her dependents if forced to repay the loans, regardless of whether (a) the disease is being properly treated, but nonetheless causes such inability, or (b) the debtor's failure to receive proper treatment is either part of the disease or is otherwise excusable." *In re Doherty*, 219 B.R. 665, 667 (Bankr. W.D.N.Y.1998). In the case at bar, Plaintiff has failed to substantiate his argument that he is suffering from ADHD. Even if the Court finds that he does, it is clear that he can function sufficiently well to prosper in his current construction business.

■ Student loan debtors claiming undue hardship as a result of a medical condition must provide evidence to corroborate their claims. *In re Pace*, 288 B.R. 788 (Bankr.S.D.Ohio 2003) (lack of corroborating evidence of debtor's claimed health issues contributed to a finding of nondischargeability); *In re Bugos*, 288 B.R. 435 (Bankr.E.D.Va.2003) (debtor's testimony regarding her symptoms and predicting whether they will substantially disable her for a substantial period of time was beyond her knowledge, background and expertise); *In re Swinney*, 266 B.R. 800 (Bankr. N.D.Ohio 2001) (medical claims in undue hardship cases require corroborating evidence, not mere allegations by the debtor). As Plaintiff did not provide corroborating evidence from his physician or psychotherapist, this Court cannot make a finding that Plaintiff suffers from any medical condition which would impact his ability to earn a living over a significant portion of the repayment period of the student loans.

■ Plaintiff claims that he suffers from ADHD, the effects of which will likely persist for a significant time period and prevent him from repaying his student loans. However, even if the Court were to find solely on the testimony of Plaintiff and his spouse that Plaintiff suffers from ADHD, the Court could not extrapolate from such a diagnosis that the effects of ADHD on Plaintiff will likely prevent him from earning enough money over the next thirty years to repay any of his student loan debt. Plaintiff testified that he is receiving psychotherapy and taking Dexadrine to treat his condition. According to the National Institute of Mental Health ("NIMH"), stimulant medications such as Dexadrine reduce ADHD patients' hyperactivity and improve their ability to focus, work, and learn, and significant, long-lasting gains appear when that medication is combined with behavioral therapy, emotional counseling, and practical support. NIMH publication on *Attention Deficit Hyperactivity Disorder* (NIH Publication No. 96–3572, Printed 1994, Reprinted 1996) (available on the Internet). The Court had the opportunity at trial to observe Plaintiff's demeanor and noticed that symptoms of hyperactivity appeared to be under control and that he had no trouble

focusing on and answering the questions presented by his own or ECMC's counsel.

█ The Court takes judicial notice of the following description of the career prospects of ADHD patients, as set forth in a brochure published by NIMH:

> All people with ADHD have natural talents and abilities that they can draw on to create fine lives and careers for themselves. In fact, many people with ADHD even feel that their patterns of behavior give them unique, often unrecognized, advantages. People with ADHD tend to be outgoing and ready for action. Because of their drive for excitement and stimulation, many become successful in business, sports, construction, and public speaking. Because of their ability to think about many things at once, many have won acclaim as artists and inventors. Many choose work that gives them freedom to move around and release excess energy. But some find ways to be effective in quieter, more sedentary careers. . . . [S]ome people strive to increase their organizational skills. Others who own their own business find it useful to hire support staff to provide day-to-day management.

NIMH publication on *Attention Deficit Hyperactivity Disorder* (NIH Publication No. 96–3572, Printed 1994, Reprinted 1996) (available on the Internet). Based upon the foregoing, it is not unreasonable to believe that Plaintiff will become successful in his construction business and earn sufficient money to repay his student loans.

Plaintiff relies on *In re Doherty*, 219 B.R. 665 (Bankr.W.D.N.Y.1998), in which the bankruptcy court found, based solely on the debtor's own testimony, that she suffered from bipolar disorder, which evidenced "additional circumstances" that her current financial situation was likely to persist for a significant portion of any repayment period. The facts of that case are clearly distinguishable from the case at bar, as there is no known cure for bipolar disorder and there was virtually no likelihood that the debtor in that case would ever be able to earn a living sufficient to pay off her student loan debt. In this case, Debtor's disorder is treatable by medication, and Debtor is able to function well in his expanding home improvement business.

In sum, the Plaintiff has not proven the second prong of the *Brunner* test. The Court finds he is able to function in his non-legal business and is able to provide income to his family and to repay his student loan over time. In the event there is a future change in circumstances, ECMC can provide appropriate relief at that time.

### III. Plaintiff Has Not Demonstrated Good Faith Efforts to Repay Student Loans.

█ The third prong of *Brunner* requires Plaintiff to prove by a preponderance of the evidence that he has made good faith efforts to repay the student loans. This prong of the analysis recognizes that undue hardship "encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *In re Elmore*, 230 B.R. 22, 27 (Bankr. D.Conn.1999). "Moreover, upon receiving the taxpayer-guaranteed loan and consequent educational benefit, a debtor assumes an obligation to make a good faith attempt at full repayment as 'measured by his or her efforts to obtain employment, maximize income and minimize expenses.' and to undertake all other reasonable efforts to insure repayment." *Id.* In this case, Plaintiff has not made a good faith effort to maximize his income and mini-

mize expenses. See the discussion under the heading *"Minimal Standard of Living," supra.*

Additionally, Plaintiff admitted that he has not made any effort to find work for an employer other than Gold Coast, his own contracting business, because of his desire to be his own boss. After considering the testimony concerning Plaintiff's creativity and remodeling skills, it is reasonable to assume that he could obtain work as a laborer or even as a designer with a general contracting company other than his own.

▬ Good faith is also measured by a debtor's effort, or lack thereof, to negotiate an alternative repayment plan. The Consolidation Program sponsored by the Department of Education offers four flexible repayment options, including one that is based on household income and family size. *See* 34 C.F.R. § 685.100 *et seq.* At any time, the borrower can switch to one of the other repayment options, depending on his circumstances. *See* 34 C.F.R. § 685.210(b). The availability of a "sliding scale" payment plan, forbearances and deferments in this Program can further overcome any concern about any future uncertainties that might pose an undue hardship to the Pobiners.

Under the Consolidation Program, Plaintiff could make payments of $404.00 per month to fulfill his obligations on his student loans. Courts have routinely examined whether or not the William D. Ford Consolidation Program has been utilized as part of the good faith analysis. *See, e.g., In re Birrane,* 287 B.R. 490 (9th Cir.BAP2002) (failure to consider consolidation program under William D. Ford program is a consideration as to whether the debtor made a good faith effort); *In re Thoms,* 257 B.R. 144 (Bankr.S.D.N.Y.2001) (debtor failed to prove undue hardship, in part, because she did not attempt to re-

structure her student loan debt). Here, Plaintiff failed to avail himself of the Consolidation Program.

▬ Finally, the ratio of a debtor's student loan debt to total debt to be discharged is considered in evaluating good faith. *See In re Holzer,* 33 B.R. 627, 632 (Bankr.S.D.N.Y.1983) (debtor must establish that purpose in filing bankruptcy petition was not to discharge student loan debt); *In re D'Ettore,* 106 B.R. 715 (Bankr.M.D.Fla.1989) (to determine debtor's good faith, the court should examine whether the dominant purpose of filing bankruptcy is to discharge student loans and the ratio of the student loans to the total indebtedness). In *D'Ettore,* the Court determined that the debtor's student loans were nondischargeable because they constituted 82% of the total debt sought to be discharged and, thus, it seemed clear that one of the dominant purposes of the bankruptcy filing was to discharge the student loans. In the present case, Plaintiff's student loan debt constitutes almost one-half of the debt that he originally sought to discharge.

Under the facts and circumstances of this case, Plaintiff has failed to demonstrate that he has made a reasonable effort to repay his student loans by seeking suitable employment and/or making sacrifices to maximize income and minimize expenses. In fact, he appears to have done just the opposite. He not only failed to actively pursue jobs in the legal field other than as a licensed attorney, but also failed to actively pursue jobs in any other field. A resume which sets forth an applicant's legal background only is certain to be discarded by a prospective employer in a non-legal field. Accordingly, he has failed to meet his burden of establishing a "good faith" effort at repayment under the *Brunner* test.

### CONCLUSION

1. This matter is before the Court pursuant to Section 523(a)(8) of the Bankruptcy Code.

2. Jurisdiction is conferred by 28 U.S.C. § 1334, and the proceeding is "core" by virtue of 28 U.S.C. § 157(b)(2)(I).

3. Plaintiff has not met his burden to demonstrate "undue hardship" by establishing all three prongs of the *Brunner* test, as required in the Second Circuit. In fact, he has not established any of the three prongs of *Brunner*.

4. Plaintiff's debt of $72,673.31, plus per diem interest of $10.56, is non-dischargeable in this Chapter 7 case.

The Court is entering an Order in accordance with this decision.