**In re Payman NORASTEH, Debtor.**

**Payman Norasteh, Plaintiff,**

**v.**

**Boston University, Defendant.**

**Payman Norasteh, Plaintiff,**

**v.**

**U.S. Department of Education, Defendant.**

**Bankruptcy No. 97 B 46564(SMB).**
**Adversary Nos. 02–8063, 02–8066.**

United States Bankruptcy Court, S.D. New York.

July 13, 2004.

Payman Norasteh, New York, NY, Pro Se.

Law Offices of Brian J. Oberman, Flora Raine, Esq. of Counsel, New York, NY, for Defendant Boston University.

United States Attorney for the Southern District of New York, Megan L. Brackney, Assistant United States Attorney, of Counsel, New York, NY, for Defendant U.S. Department of Education.

## POST–TRIAL DECISION

STUART M. BERNSTEIN, Chief Judge.

The plaintiff, Payman Norasteh, is a chapter 7 debtor. He commenced these adversary proceedings, *pro se*, against Boston University and the United States Department of Education (the "Government" or the "Department") to determine the dischargeability of his student loan obligations. The cases were tried jointly on March 24, 2004, and the Court received additional post-trial evidence from the debtor in the form of a letter dated April 22, 2004 (the "Letter"). For the reasons that follow, the Court concludes that judgment should be entered dismissing the adversary proceedings.

## BACKGROUND

### A. Educational Background and Work History

The debtor grew up in Teheran, Iran, and emigrated to the United States in 1987 when he was in his early twenties. After attending college in Connecticut, he transferred to Boston University, from which he received a bachelor's degree in electrical engineering in May 1994, and a master's degree in electrical engineering in January 1996. (Tr.[1] at 7–8.)

After leaving Boston University, the debtor "continued dealing with numerous health issues and underwent further treatments for depression, amongst other issues." (Letter, at 4[2].) In March 1996, he found a temporary job, but lost it in about five weeks. (*Id.*) Between June 1996 and the late summer of 1997, the debtor was unemployed, and received public assistance. (*See* Tr. at 8–9.) In late August or early September 1997, the debtor took a job with Silicon Valley Group in Richfield, Connecticut as a Basic Engineer at an approximate annual salary of $40,000.00. (*See id.* at 10–11.) The debtor spent between five and six months on medical leave, (Letter, at 5), and left Silicon Valley Group in May 2000. (Tr. at 12.)

In June 2000, the debtor accepted employment with Salomon Smith Barney in New York City as an "Administrator" at an annual salary of $50,000.00. (*Id.* at 16.) He was laid off in July 2001, but received his salary until August 7, 2001, and thereafter, remained unemployed until November 2002. (*Id.* at 16–18.) From November 2002, until September 2003, the debtor taught an SAT preparation course on a part-time basis, earning $7.00 per hour, (*id.* at 20–21), and in September 2003, he accepted his present position teaching high school mathematics at St. George's Ukrainian Catholic Church at an approximate annual salary of $30,000.00 per year. (*Id.* at 22–23.)

---

1. "Tr." refers to the transcript of the trial held on March 24, 2004.

2. The debtor did not number the pages of the nine-page Letter. The Court numbered the chambers copy manually.

## B. The Student Loans

The debtor paid for a substantial portion of his education at Boston University with student loans that he received through the Government's "William D. Ford Federal Direct Loan Program." He consolidated his existing loans several times, both before and after he filed his chapter 7 petition. As of March 24, 2004, the debtor owed the Department the principal loan amount of $101,753.82, plus $7,582.12 in interest, for a total debt of $109,195.03. (Tr. at 83; GX[3] A, at A1.)

The debtor also borrowed $5,000.00 directly from Boston University. (*See* Tr. at 51.) On or about June 12, 2002, Boston University recovered a judgment against the debtor in the sum of $7,005.96. (*Id.* at 52.)

## C. The Non–Payment of the Student Loans

The debtor's Government student loan first became due on August 28, 1996, (*id.* at 98), but he never made any payments on account of either the Government or Boston University loans. (*Id.* at 39, 44.) The Government has, however, continuously granted the debtor periods of grace during which he has been relieved of any obligation to make payments.

The Department may, in this regard, grant a borrower a deferment, 34 C.F.R. § 685.204 (2003), or forebear from collection, *id.*, § 685.205, when the circumstances warrant it; each is a form of temporary postponement of payment. (Tr. at 86.) Although they involve different criteria, the grant of either a deferment or a forbearance generally reflects the Department's determination that the borrower is then currently unable to make payment. (*See* Tr. at 100.) Based on the debtor's requests, (*see* GX A, at A41, A43, A45–56), the Department granted a deferment or forbearance from the time his loan first became due until the time of the trial.[4] (*See* Tr. at 99–100, 103–04, 111–12.)

## D. The Payment of Other Debts

While the debtor never paid the student loans at issue, he paid other debts or used whatever assets he could spare for other purposes during the same period. For instance, in 1997 or 1998, and in 2001, he repaid a total of $9,000.00 in connection with two private educational loans.[5] (*Id.* at 38–39.)

---

**3.** "GX" refers to the Government's exhibits received in evidence.

**4.** In addition to the deferment and forbearance programs, the Department will work with a borrower to structure a repayment program consistent with his abilities and needs. Under the Income Contingent Repayment Plan, *see* 34 C.F.R. § 685.209, the borrower's monthly payments are calculated based on the borrower's annual income, his family size, and the total amount of the loan. (Tr. at p. 90–91, line 1; GX A, at A58.) The borrower pays the lesser of (1) the amount the borrower would pay if the loan were repaid in twelve years multiplied by a factor that varies with the borrower's annual income, and (2) twenty percent of the borrower's discretionary income, *i.e.*, the borrower's adjusted gross income minus the poverty level for the bor-

rower's family size. If the borrower's income is less than or equal to the poverty level, the borrower's monthly payment is zero. (Tr. at 90.)

The maximum repayment period is twenty-five years, but the Department recalculates the payment annually based on the information submitted by the borrower. (*Id.* at 91–93.) After twenty-five years, the unpaid portion of the loan is discharged. (*Id.* at 91; GX A, at A58.) Based on the debtor's 2002 income ($9,123), his monthly payment would have been $5.00, (Tr. at 92), but based on his current annual income of $30,000.00, his monthly payment would be $353.33. (*Id.* at 92–93.)

**5.** The debtor paid his private educational loans because the interest rate on his private loans was higher than his educational loans,

When he worked at Silicon Valley Group, he invested up to 20% of his salary in a 401K plan, and eventually accumulated $20,000.00. (*Id.* at 43–44, 65.) Because he invested so much of his income, he did not have enough money to pay for necessities, and charged his food, gas, and other expenses on a relative's credit card. (*Id.* at 66–67.) It appears that he used the 401K money to repay the relative. (*See id.* at 67.)

In 2000, the debtor invested approximately $6,000.00 in an IRA. (*Id.* at 44.) He intended to use it to make a down payment on a house someday. (*Id.* at 67–68.) The record did not reflect what became of the $6,000.00.

In February 2000, the debtor received a settlement of approximately $7,500.00 as the result of a car accident, and invested the entire amount in the stock market. He lost all but $247.00, and testified that he returned the balance to the person who hit his car. (*Id.* at 44, 72–73, 74.)

## DISCUSSION

### A. Introduction

With certain exceptions, § 727 of the Bankruptcy Code discharges the individual debtor from personal liability for his prepetition debts.[6] One exception is contained in § 523(a)(8) which states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made

under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents. . . .

▬▬ The debtor filed these adversary proceedings relying on the "undue hardship" exception contained in § 523(a)(8). The statute does not define "undue hardship," but the threshold showing is a high one. "Because any debtor in bankruptcy usually has significant financial problems, a finding of undue hardship will not be based simply on the debtor's difficulty in making payments." *Williams v. New York State Higher Educ. Servs. Mgmt. Corp. (In re Williams)*, 296 B.R. 298, 302 (S.D.N.Y.2003). In *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir.1987), the Second Circuit established a three-part test for evaluating claims of "undue hardship:"

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 396.

▬▬ The borrower must prove each element by a preponderance of the evi-

---

and he did not want the co-signer on the private loans to be held responsible. (Tr. at 38.)

**6.** (a) The court shall grant the [individual] debtor a discharge. . . .

(b) Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter. . . .

dence. *Thoms v. Educational Credit Mgmt. Corp. (In re Thoms)*, 257 B.R. 144, 148 (Bankr.S.D.N.Y.2001); *Fowler v. Connecticut Student Loan Foundation (In re Fowler)*, 250 B.R. 828, 830 (Bankr.D.Conn. 2000). The failure to prove any one of the three elements is fatal to the claim. *See, e.g., Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir.1995); *In re Williams*, 296 B.R. at 302; *In re Thoms*, 257 B.R. at 148; *Lehman v. New York Higher Educ. Servs. Corp. (In re Lehman)*, 226 B.R. 805, 808 (Bankr.D.Vt.1998).

## B.  Applying the *Brunner* Test

### 1.  The First Prong

The Court has little difficulty finding that the debtor satisfied the first *Brunner* prong. He currently nets $872.00 in salary every two weeks, or approximately $1,750.00 per month. (Tr. at 23.) His recurring monthly expenses include rent ($752.00), telephone ($35.00–$40.00), food ($500.00), transportation ($40.00), and clothing ($20.00). (*Id.* at 25; Letter, at 7.) These expenses account for approximately $1,350.00, leaving only $400.00. The debtor would also have to pay $353.00 per month to the Department under the Income Contingent Repayment Plan, (Tr. at 92–93), and I assume that Boston University could compel the payment of 10% of his salary pursuant to an income execution. *See* N.Y.C.P.L.R. 5205(d)(2) (McKinney 1997). Finally, the debtor has another student loan in the principal amount of $22,000.00. (Letter, at 6.) The debtor maintains a minimal standard of living devoid of virtually any discretionary spending, and neither defendant has suggested that he can cut his expenses. In fact, the Court's conclusion matches the one consistently reached by the Department since

1996—the debtor cannot repay his loan in light of his current circumstances.

### 2.  The Third Prong

The Court also finds that the debtor satisfied the third *Brunner* prong. It is not disputed that the debtor never repaid any part of either defendant's loan, but this does not end the inquiry into his good faith. *Educational Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1311 (10th Cir.2004) ("the failure to make a payment, standing alone, does not establish a lack of good faith"). A finding of good faith instead turns on several considerations including the debtor's efforts to obtain employment, maximize his income, minimize his expenses, and participate in alternative repayment options. *Pobiner v. Educational Credit Mgmt. Corp. (In re Pobiner)*, 309 B.R. 405, 420–21 (Bankr.E.D.N.Y. 2004); *see Pace v. Educational Credit Mgmt. Corp. (In re Pace)*, 288 B.R. 788, 793 (Bankr.S.D.Ohio 2003); *Chambers v. National Payment Ctr. (In re Chambers)*, 239 B.R. 767, 770 (Bankr.N.D.Ohio 1999); *Douglass v. Great Lakes Higher Educ. Servicing Corp. (In re Douglass)*, 237 B.R. 652, 657 (Bankr.N.D.Ohio 1999).

Neither defendant contended that the debtor did not try to find work, maximize his income or minimize his expenses. Rather, the bad faith argument rested primarily on two points. First, the Department argued that the debtor neglected to opt into an alternative repayment plan.[7] Second, both defendants maintained that the debtor had other assets that he could have used to repay their loans.

The first argument suffered from an inherent inconsistency. The Government granted the debtor a series of deferments or periods of forbearance during the entire repayment period, including when the

---

7.  Boston University did not offer evidence of alternative repayment plans.

debtor was working and earning a salary. (*See* GX A, at A45–53.) This reflected the Government's decision that the debtor was unable and would be unable to pay the loan during the particular grace period. Having concluded that the debtor's financial inability lasted from 1996 up to the present, the Government is hard-pressed to argue that the debtor nevertheless acted in bad faith by failing to pay his loan under one of the alternative repayment options.[8] In fact, the borrower's obligation to repay his Government student loan is expressly made subject to the deferment and forbearance provisions in the regulations. *See* 34 C.F.R. § 685.207(a)(2).

The second part of the bad faith argument rested on the debtor's possession of other assets, primarily pensions, and his use of those assets to pay other debts, including a private student loan. However, the regulations that govern the granting of a deferment or forbearance depend, in pertinent part, on the borrower's employment status, 34 C.F.R. § 685.204(b)(2), medical condition, *id.,* § 685.205(a)(1), whether he is receiving public assistance, *id.,* § 682.210(s)(6)(ii) or a formula-driven comparison of income and expenses. *Id.,* §§ 682.210(s)(6)(iii-v), 685.205(a)(6). The regulations appear to ignore the borrower's balance sheet, and do not require him to use his other assets to pay down his student loan as a condition to the grant of a deferment or forbearance.

### 3. The Second Prong

■ The Court nonetheless concludes that the debtor failed to prove the second *Brunner* prong, *i.e.,* that additional circumstances exist indicating that his situation is "likely to persist for a significant portion of the repayment period of the student loans." *Brunner,* 831 F.2d at 396. The debtor appeared to be intelligent, well-educated and motivated. His problem has been his inability to find and hold on to a job with a salary sufficient to repay his loans. He blamed this on a variety of factors, including poor training as an engineer and the limited availability of jobs in his area, (Tr. at 27, 29, 33), his unwillingness or inability to retrain, (*id.* at 59, 60, 63), his lack of familiarity with the American culture or connections in the United States, (*id.* at 62), and his national origin. (Letter, at 6.)

■ The debtor seemed angry that he borrowed so much money to acquire his degrees, but his education never translated into a high paying job. His frustration is understandable, but his inability to benefit financially from the course of study he selected is immaterial. *See Kraft v. New York State Higher Educ. Servs. Corp. (In re Kraft),* 161 B.R. 82, 85 (Bankr.W.D.N.Y. 1993) (the *Brunner* test "does not permit discharge of a student loan on the basis that the Debtor made a poor career choice (or was misled) in selecting the curriculum that the loan financed"); *Brunner v. New York State Higher Educ. Servs. Corp. (In re Brunner),* 46 B.R. 752, 756 n. 3 (S.D.N.Y.1985) (a court may not consider whether the particular education has been of any use to the debtor), *aff'd,* 831 F.2d

---

8. Moreover, the present repayment plan proposed by the Government would impose an undue hardship on the debtor. Under the Income Contingent Repayment Plan, the debtor would have to pay $353.00 per month. As discussed earlier in connection with the first *Brunner* prong, the debtor could not make this payment, pay his other monthly expenses, and still maintain a minimal standard of living. While the Government also adduced evidence that the debtor's 2002 monthly payment would have been only $5.00, (Tr. at 92), that sum reflects the minimum payment greater than $0.00 allowable under the Income Contingent Repayment Plan, *see* 34 C.F.R. § 685.209(a)(6), and does not mean that the borrower could afford to pay even that small amount.

395 (2d Cir.1987). The borrower rather than the taxpayers must bear the risk that his Government-financed education will pay dividends.[9] Furthermore, the other factors that the debtor identified do not support a finding that they have prevented him or will prevent him from locating a higher paying job.

The debtor's principal problem, barely mentioned at trial, appears to be a medical one. The debtor took lengthy medical leaves of absence from work in the past, suffered from various physical ailments, and underwent treatment for depression. (*See* Letter, at 4.) He did not, however, submit any corroborative medical evidence at the trial. The deficiency in proof highlighted a fundamental problem with "undue hardship" litigation. On the one hand, this debtor, like many, appeared *pro se,* and lacked the money to pay treating or expert medical professionals to come to court and testify on his behalf. *See Doherty v. United Student Aid Funds, Inc. (In re Doherty),* 219 B.R. 665, 669 (Bankr. W.D.N.Y.1998). On the other hand, most judges are lay persons, and require some medical evidence to determine the nature, extent and likely duration of a disability.

There are parallels in other areas that suggest solutions. For example, administrative law judges in the Social Security Administration regularly make determinations regarding disabilities, without the need for medical testimony, based upon comprehensive federal regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Even in "undue hardship" litigation, courts have relied on available medical literature in deciding if the debtor's medical condition met the second prong of the *Brunner* test. *See, e.g., In re Pobiner,* 309 B.R. at 419–20 (consulting a publication of the National Institute of Mental Health regarding the career prospects for persons suffering with Attention Deficit Hyperactivity Disorder); *In re Doherty,* 219 B.R. at 670 (consulting a publication of the National Institute of Mental Health and other medical publications and treatises regarding bi-polar disorder).

█ At a minimum, however, a borrower seeking an "an undue hardship" discharge must provide corroborative evidence that he had an impairment that prevents him from earning enough to repay his student loans, and that the impairment is likely to persist well into the future. *See In re Pobiner,* 309 B.R. at 419; *Chime v. Suntech Student Loan (In re Chime),* 296 B.R. 439, 445 (Bankr. N.D.Ohio 2003); *In re Pace,* 288 B.R. at 793; *Swinney v. Academic Fin. Servs. (In re Swinney),* 266 B.R. 800, 805 (Bankr. N.D.Ohio 2001). A judge can observe the witness and hear him describe his symptoms, but a judge cannot make a diagnosis or determine the severity of the impairment based on that alone.

This brings us to the present case. The plaintiff did not offer evidence, such as medical reports, to corroborate a persistent impairment.[10] During his testimony, he referred to treatment for depression.

---

9. This particular concern may not apply to Boston University. Nevertheless, the debtor assumed a contractual obligation to repay an educational debt that was not conditioned on the use of that education to find a high paying job.

10. Throughout the case, the Court urged the debtor to provide the defendants with information regarding any medical condition that affected his ability to work. The debtor reluctantly provided the Court with copies of his medical records, and these were eventually turned over to the defendants. The Department pre-marked the medical records, included them in its book of trial exhibits, but never offered them. The debtor also never offered his medical records into evidence, and they did not become part of the trial record.

He did not, however, submit medical reports identifying his symptoms, diagnosing his condition, or indicating its severity or probable duration. If the debtor suffers from some form of depression, so does nearly ten percent of the adult population in any one year. *See Depression,* NIH Publication No. 00–3561 (2000), *available at* http://www.nimh.nih.gov/publicat/depression.cfm.

This does not ignore the fact that depression varies in type and degree, and some forms are doubtless utterly and persistently debilitating. Nevertheless, the variation in the types of depression underscores the need for competent evidence to assist the Court in determining the severity and probable duration of the borrower's disabling condition. Although the Court's own observations of the debtor and consideration of his employment history raise substantial doubt that he will ever earn enough to repay his student loans, and, at the same time, maintain a minimal standard of living, this conclusion is not corroborated by any medical evidence. Accordingly, the Court is compelled to conclude that the debtor did not meet his burden of proving the second prong of the *Brunner* test.

The debtor has, therefore, failed to sustain his burden of proving that repayment of the Government and Boston University student loans would constitute an "undue hardship." Accordingly, the loans are not dischargeable. In light of this conclusion, it is unnecessary to reach the Government's alternative argument that the consolidation of the debtor's pre-petition student loans after the chapter 7 case was commenced converted them into post-petition debts that would not be discharged under any circumstances.

The foregoing constitutes the Court's findings of fact and conclusions of law. The Government and Boston University are directed to submit proposed judgments consistent with this opinion.